[Cite as *Jones v. MetroHealth Med. Ctr.*, 2016-Ohio-4858.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 102916

---

# ALIJAH JONES, ET AL.

**PLAINTIFFS-APPELLANTS/
CROSS-APPELLEES**

vs.

# METROHEALTH MEDICAL CENTER, ET AL.

**DEFENDANTS-APPELLEES/
CROSS-APPELLANTS**

---

## JUDGMENT:
### AFFIRMED IN PART, REVERSED IN PART,
### AND REMANDED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-11-757131

**BEFORE:**   Stewart, J., Kilbane, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:**   July 7, 2016

**ATTORNEYS FOR APPELLANTS/CROSS-APPELLEES**

Michael F. Becker
Pamela E. Pantages
The Becker Law Firm Co., L.P.A.
134 Middle Avenue
Elyria, OH 44035

Paul W. Flowers
Paul W. Flowers Co., L.P.A.
Terminal Tower, Suite 1910
50 Public Square
Cleveland, OH 44113


**ATTORNEYS FOR APPELLEES/CROSS-APPELLANTS**

**For MetroHealth Medical Center, et al.**

Leslie Moore Jenny
Jason P. Ferrante
Marshall, Dennehey, Warner, Coleman & Goggin
127 Public Square, Suite 3510
Cleveland, OH 44114

Susan M. Audey
Irene Keyse-Walker
Tucker Ellis L.L.P.
950 Main Avenue, Suite 1100
Cleveland, OH 44113

**For Ohio Hospital Association, et al.**

Anne Marie Sferra
Bricker & Eckler L.L.P.
100 South Third Street
Columbus, OH 43215

Sean McGlone
Ohio Hospital Association, Inc.
155 East Broad Street, Suite 301
Columbus, OH 43215

MELODY J. STEWART, J.:

**{¶1}** A jury awarded plaintiff-appellant Stephanie Stewart, as mother and next friend of her son, plaintiff-child Alijah Jones, a combination of past and future economic damages, and non-economic damages in the amount of $14.5 million on their medical malpractice action against defendants-appellees MetroHealth Medical Center and Steven Weight, M.D. In post-trial proceedings, and over Stewart's objections, the trial court ordered statutory offsets of collateral sources for political subdivisions as required by R.C. 2744.05(B)(1) and damage caps on non-economic damages as required by R.C. 2744.05(C)(1). This reduced the total award to $3.451 million.

**{¶2}** In this appeal, Stewart argues that MetroHealth did not prove its political subdivision status as a predicate for asserting its right to statutory offsets. She also argues that because there were no interrogatories submitted to the jury from which it could be determined what amount of the damages award was an amount for lost wages as opposed to loss of services, the court had to speculate on the composition of the award and could not have determined MetroHealth's right to an offset to a reasonable degree of certainty. Stewart also maintains that the court misconstrued the evidence relating to both past and future economic damages and speculated on the jury's intent to award damages only on a life care plan to the exclusion of all other future damages components. Finally, Stewart raises an as-applied constitutional challenge to the enforcement of the

collateral source setoffs, as well as constitutional challenges based on due process, equal protection, separation of powers, and the right to a trial by jury.

{¶3} MetroHealth raises a conditional cross-appeal, to be considered only in the event our disposition of Stewart's appeal reverses or modifies the court's order offsetting economic damages or limiting non-economic damages.

{¶4} We conclude that R.C. 2744.05 is constitutional in all respects. We also conclude that the court did not err by conducting a post-trial hearing to determine MetroHealth's right to a statutory offset and the amount of that offset. We do, however, conclude that the amount of offset ordered by the court was not determined to a reasonable degree of certainty because the court failed to consider the extent to which the jury's award may have included damages for future loss of income. We reject in whole MetroHealth's cross-appeal.

## I. The Appeal

{¶5} The jury's verdict and the damages it awarded resulted from a finding that Dr. Weight and MetroHealth failed to adhere to the applicable standard of care when managing Stewart's pregnancy and supervising the birth of her son. Those failures resulted in the child being born at 25 weeks by way of Caesarean section. The child suffers from cerebral palsy, developmental delays, and visual impairment. The medical experts agreed that Stewart's son will need 24-hour attendant care for the remainder of his life. The jury specified the damages award as follows: to the child — $500,000 for

past economic damages, $5 million in non-economic damages, and $8 million for future economic damages; to Stewart — $1 million for non-economic damages.

{¶6} Before trial concluded, MetroHealth filed a motion asking the court to conduct a post-verdict hearing to determine the amount of any collateral benefits to be offset from a jury award against it as required by R.C. 2744.05(B)(1) . In post-trial motions, MetroHealth asked the court to enforce the $250,000 cap on non-economic damages pursuant to R.C. 2744.05(C)(1) and Stewart raised a constitutional challenge to both R.C. 2744.05(B)(1) and  2744.05(C)(1).

{¶7} R.C. 2744.05(B)(1) states that if a claimant is entitled to receive or does receive benefits for injury or loss from insurance or other sources, "the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant." R.C. 2744.05(C)(1) states that "damages that arise from the same cause of action, transaction or occurrence, or series of transactions or occurrences and that do not represent the actual loss of the person who is awarded the damages shall not exceed two hundred fifty thousand dollars in favor of any one person."

{¶8} After conducting a post-trial hearing on MetroHealth's motion, the court issued a written decision granting the motion. Under authority of R.C. 2744.05(C)(1), the court capped the child's $5 million non-economic damages award at $250,000 and likewise capped Stewart's $1 million non-economic damages award at $250,000.

{¶9} The court considered two separate offsets for collateral sources as required by R.C. 2744.05(B)(1): one for the child's $500,000 award for past economic damages; the

other for his $8 million award for future economic damages. The court found, over Stewart's objection, that all of the child's past medical bills were included in the award for past economic damages. It reached this conclusion based on uncontradicted testimony from an expert who testified that neither Stewart nor the child had any out-of-pocket expenses because the medical bills had been paid in full by Medicaid and Social Security.

{¶10} The court ordered an offset of future economic damages for all medical expenses that the child would incur after his 20th birthday. It found it undisputed that the child would qualify for Medicare on his 20th birthday because of his father's disability, and that Medicare would pay all future medical expenses from that point in time forward. Looking only at the eight-year period between the child's age at the time of the post-trial hearing (12 years old) and his eligibility for Medicaid at age 20, the court concluded that the child could obtain medical insurance under the Affordable Care Act until he became eligible for Medicare. The court determined that the child's maximum expenses for the eight-year period would be $116,000: a maximum $8,000 per year premium for medical insurance and a yearly, maximum out-of-pocket expense of $6,500. The court concluded that expenses allocated in the life care plan should be offset in their entirety (excepting costs for transportation, home care, and housing) and that the remaining amount should be offset by 80 percent to account for what Medicare would cover. After making these deductions, the court reduced the child's award for future economic damages to $2,951,291.

## A. Statutory Offset

**{¶11}** In her first assignment of error, Stewart complains that the court erred by applying the damages cap and offset provisions of R.C. 2744.05 to MetroHealth because no immunity was available to attach to a political subdivision. Stewart argues that sovereign immunity — the concept that the state cannot commit a legal wrong and is immune from civil suit or criminal prosecution — applies only to the state of Ohio and not to political subdivisions. Noting that Section 16, Article I, of the Ohio Constitution states that, "[s]uits may be brought against the state, in such courts and in such manner, as may be provided by law," Stewart maintains that the state waived immunity, but that waiver does not apply to political subdivisions due to R.C. 2743.01(B), which defines "political subdivisions" as municipal corporations and bodies politic "to which the sovereign immunity of the state attaches." By Stewart's reckoning, if the state has waived immunity from suit, political subdivisions can have no immunity of their own because their immunity is based on the state's immunity.

**{¶12}** Stewart's argument is essentially taken from dicta in the lead opinion in *Butler v. Jordan*, 92 Ohio St.3d 354, 750 N.E.2d 554 (2001). The proposition on which she relies is not law.

**{¶13}** In *O'Brien v. Olmsted Falls*, 8th Dist. Cuyahoga Nos. 89966 and 90336, 2008-Ohio-2658, we reached this same conclusion and noted the many appellate districts that have "refused to declare R.C. [Chapter] 2744 unconstitutional despite the plurality's

pronouncement in *Butler*." *Id.* at ¶ 26 (collecting cases). Stewart has provided no compelling reason for us to depart from our precedent and that of other appellate districts.

{¶14} Stewart next argues that MetroHealth failed to offer evidence at trial that it is a qualifying hospital under R.C. 2744.05. She maintains that not every hospital owned by the government is entitled to political subdivision status — that status attaches only if the county hospital commission is appointed pursuant to R.C. 339.14. According to Stewart, this was a fact that MetroHealth had the burden of establishing at trial and the court erred by accepting evidence from MetroHealth on the issue in a post-trial hearing.[1]

{¶15} R.C. 2744.05 applies to actions against "a political subdivision" to recover damages for injury, death, or loss to person or property caused by an act or omission in connection with a governmental or proprietary function. A "political subdivision" is defined as, among other things, "a county hospital commission appointed under section 339.14 of the Revised Code[.]" R.C. 2744.01(F). R.C. 339.14(A) allows a board of county commissioners to appoint a hospital commission preparatory to establishing a general hospital or hospital facility.

{¶16} The question of whether a political subdivision is immune from civil liability is a question of law. *Conley v. Shearer*, 64 Ohio St.3d 284, 292, 595 N.E.2d 862 (1992); *Sampson v. Cuyahoga Metro. Hous. Auth.*, 188 Ohio App.3d 250, 2010-Ohio-3415, 935 N.E.2d 98, ¶ 21 (8th Dist.).

---

[1] Stewart offers no argument on appeal that MetroHealth is not a political subdivision for purposes of R.C. 2744.05.

**{¶17}** MetroHealth did not offer any evidence at trial in support of its status as a political subdivision; however, we agree with MetroHealth that it was not required to offer that evidence during trial. The statutory deduction for collateral benefits and application of damages caps is to be made by the trial court in post-trial proceedings. This conclusion follows from *Buchman v. Bd. of Edn.*, 73 Ohio St.3d 260, 652 N.E.2d 952 (1995), where the third paragraph of the syllabus states: "[p]ursuant to R.C. 2744.05(B), future collateral benefits, to the extent they can be determined with a reasonable degree of certainty, are deductible from the jury's verdict against a political subdivision." The court's "determination" cannot occur until the jury has rendered a verdict including damages, so it is necessarily conducted post-trial.

**{¶18}** What is more, although non-binding, the lead opinion in *Buchman* [2] understood that R.C. 2744.05 contemplated a post-trial proceeding in which evidence was presented "both at trial and during the post-verdict collateral benefits hearing * * *." *Id*. at 275. *Buchman* did so by noting that R.C. 2744.05(B) does not "abrogate that aspect of the collateral source rule which provides that the 'receipt of [collateral] benefits is not to be admitted in evidence, or otherwise disclosed to the jury.'" *Id*. at 270, quoting *Pryor v. Webber*, 23 Ohio St.2d 104, 109, 263 N.E.2d 235 (1970).

**{¶19}** We are persuaded that R.C. 2744.05(B) requires a post-trial hearing in which the trial judge is authorized to hear additional evidence. The text of R.C.

---

[2] Only the syllabus to *Buchman* received a majority of votes, so nothing contained in the *Buchman* opinion is binding law.

2744.05(B)(1) states that if a claimant receives or is entitled to receive benefits for injuries or loss, those benefits "shall be disclosed to the court[.]" Although the statute does not explicitly state who has the duty to disclose a claimant's receipt of benefits, the claimant, as the party in receipt of the benefits that might be subject to offset, would be in the best position to make disclosure to the court.

{¶20} We also believe that R.C. 2744.05(B)(1) requires a post-trial proceeding because mandatory offset implicates the collateral source rule — the jury's knowledge that a political subdivision might be entitled to a statutory damages deduction could improperly affect its determination of damages. What is more, evidence going to a political subdivision's status at trial would be irrelevant to the underlying action. For these reasons, we hold that R.C. 2744.05(B) sanctions a bifurcated proceeding where the court, not the jury, decides the amount that must be offset from a damage award against a political subdivision for any benefits a claimant has received for a loss or injury. The nature of this statutory process is such that we reject Stewart's contention that the court erred by hearing "new" evidence when ruling on MetroHealth's motion for judgment notwithstanding the verdict in which it raised for post-trial hearing its entitlement to the R.C. 2744.05(B) offsets.

{¶21} After the jury's verdict, MetroHealth asked the court to grant it judgment notwithstanding the verdict under Civ.R. 50(B). A Civ.R. 50(B) motion for judgment notwithstanding the verdict tests the legal adequacy of the evidence, *O'Day v. Webb*, 29 Ohio St.2d 215, 280 N.E.2d 896 (1972), paragraph two of the syllabus, so it is based

solely on the evidence produced at trial. MetroHealth did, in fact, raise substantive arguments in support of a judgment notwithstanding the verdict, but in addition to those arguments, it sought to invoke the court's post-trial jurisdiction to commence the proceeding envisioned by R.C. 2744.05(B). It stated its intention to do so prior to trial. We express no opinion on whether using a Civ.R. 50 motion for judgment notwithstanding the verdict is the most appropriate vehicle for seeking a statutory offset, but we acknowledge that the motion invoked the court's post-trial jurisdiction. And given that MetroHealth gave notice prior to trial that it intended to seek an offset of damages and the application of caps on non-economic damages, Stewart cannot complain that she was surprised by MetroHealth's motion.

{¶22} Regarding Stewart's argument against the court's ruling that MetroHealth was a political subdivision for purposes of R.C. Chapter 2744 immunity, the United States Court of Appeals for the Sixth Circuit has recognized that MetroHealth is a political subdivision. *See Johnson v. Ohio Supreme Court*, 156 Fed.Appx. 779, 779 (6th Cir.2005). And other county hospitals have been recognized as political subdivisions. *See, e.g.*, *Hall v. Mem. Hosp. of Union Cty.*, 3d Dist. Union No. 14-06-03, 2006-Ohio-4552, ¶ 12 (noting that parties did not dispute that Memorial Hospital of Union County was a political subdivision). Stewart's argument rests on the technicality that MetroHealth did not prove its political subdivision status at trial, not on any assertion that MetroHealth is not actually a county hospital recognized as a political subdivision. Having concluded that the court can hear additional evidence at a R.C. 2744.05 post-trial

hearing, the court did not err by concluding, post-trial, that MetroHealth is a county hospital and a political subdivision for purposes of R.C. 2744.05.

{¶23} Stewart next argues that the court failed to adhere to the strict *Buchman* standard of a "reasonable degree of certainty" when determining the extent to which future collateral benefits were deductible from the jury's verdict. She concedes that the court stated its findings in terms of a reasonable degree of certainty, but claims that it could not possibly have done so within the spirit of the law because the jury's award of future economic damages was not tested by interrogatories that apportioned specific categories of loss like lost wages or lost services. In other words, Stewart argues that in the absence of the jury breaking down how the damages were apportioned, the court could only guess at what amount of the general verdict was made up of damages covered by a collateral source, belying the court's assertion that those amounts subject to offset were proven to a reasonable degree of certainty.

{¶24} When a political subdivision is found liable to pay damages caused by any injury resulting from an act or omission in connection with a governmental or proprietary function, R.C. 2744.05(B)(1) permits the court to offset from those damages future collateral benefits received by the claimant:

> If a claimant receives or is entitled to receive benefits for injuries or loss allegedly incurred from a policy or policies of insurance or any other source, the benefits shall be disclosed to the court, and the amount of the benefits shall be deducted from any award against a political subdivision recovered by that claimant. No insurer or other person is entitled to bring an action under a subrogation provision in an insurance or other contract against a political subdivision with respect to those benefits.

"It is the political subdivision's burden to prove the extent to which it is entitled to an offset under R.C. 2744.05(B)," but "only to the extent that the loss for which it compensates is actually included in the jury's award." *Buchman*, 73 Ohio St.3d 260, 652 N.E.2d 952 (1995), at paragraphs four and five of the syllabus. Jury interrogatories are not required to quantify the categories of damages that make up the general verdict, although they are typically the "most efficient and effective method" of doing so. *Id*. at 270.

### B. Past Economic Loss

{¶25} The court completely offset the $500,000 award for past economic damages under R.C. 2744.05(B)(1) because testimony heard at the post-trial hearing showed that Stewart paid nothing out-of-pocket for the child's medical bills. Stewart argues that the court erred by relying on evidence not heard by the jury when deciding that the $500,000 award of past economic damages must be offset in full because they consisted of medical expenses that had been paid. She claims that MetroHealth should not have been allowed to present a registered nurse in the post-trial hearing to testify regarding the amount of the medical bills and that those bills were paid in full by Medicaid.

{¶26} We reject Stewart's contention for the reasons previously stated in our discussion of the scope of a R.C. 2744.05 hearing — the court had the ability to hear, post-trial, additional evidence on the question of whether benefits received by the plaintiff should be offset from any award against a political subdivision.

**{¶27}** In addition, we find no basis for questioning the amount of past economic damages that were subject to offset. During trial, Stewart offered into evidence an itemized statement of medical bills for past care totaling $518,633.75. Stewart testified at trial that her son's total medical bills were "a little over $500,000" and in closing argument, her counsel told the jury that past medical bills were "somewhere around half a million dollars." The jury awarded $500,000. Although that amount did not match exactly with the itemized medical bills, the award was consistent with both Stewart's testimony and the amount trial counsel asked the jury to award. Tellingly, Stewart made no argument post-trial that the jury erred by failing to award her past economic damages consistent with her itemized medical bills, nor has she separately raised the issue on appeal.

**{¶28}** Stewart now argues, however, that the court's decision to offset the entire $500,000 award for past economic damages fails to take into account that some aspect of the award might have included compensation for expenses incurred by Stewart and two relatives for the transportation and care of her son when taking him to out-of-town medical appointments.

**{¶29}** Stewart offered no evidence to document transportation and care expenses for her son and did not ask the jury to award damages for expenditures she and other family members incurred. The closing argument on the value of past economic damages consisted of this: "[The child's] past medical bills. [Stewart] told you they're somewhere around half a million dollars." The court instructed the jury that it could award damages

based on, among things, "expenditures" incurred as a result of the child's injury and loss. Based on the evidence presented, the court could be reasonably certain that the $500,000 award encompassed all of the child's past economic damages requested by Stewart.

{¶30} Stewart also argues that MetroHealth waived its right to offsets under R.C. 2744.05(B)(1) by failing to offer evidence of what her son's medical providers accepted in full payment of what they billed. Conceding that "the amount of paid medical expenses versus the amount billed is irrelevant to the set-off issue before this Court," appellant's brief at 16, Stewart nonetheless cites *Robinson v. Bates*, 112 Ohio St.3d 17, 2006-Ohio-6362, 857 N.E.2d 1195, for the proposition that MetroHealth had to challenge the cost of past medical care or else waive its entitlement to offset.

{¶31} In *Robinson*, the Supreme Court held that "the collateral-source rule does not apply to bar evidence of the amount accepted by a medical care provider from an insurer as full payment for medical or hospital treatment." *Id.* at ¶ 1. Stewart implies that MetroHealth had the obligation to minimize the child's past economic damages at trial, but *Robinson* says nothing about that — it discussed what a jury "may" consider in evaluating the reasonable value of medical expenses. In other words, both the amount charged by medical providers and the amount accepted by those providers are admissible into evidence. *Id*. at paragraph one of the syllabus. The question of what constitutes the reasonable value of medical care provided is left to the jury. *Id*. at ¶ 18.

{¶32} Nothing in *Robinson* places the obligation on a defendant to offer evidence of the amount accepted in payment of medical care. In the typical medical malpractice

action, the plaintiff will want to introduce evidence of the amount actually charged (usually the higher amount) while the defendant will seek to introduce evidence of the amount accepted by the medical care provider (usually the lower amount). That Stewart is now claiming that MetroHealth had the obligation to offer evidence of the amount accepted in full payment by the child's medical providers underscores her failure to offer that evidence herself at trial. In fact, her current argument is one that could have lowered the past economic damages award.

{¶33} The court correctly determined that the entire $500,000 award for past economic damages consisted solely of medical expenses. Stewart does not deny that those medical expenses were paid in full by other sources. There is no question that those payments were benefits for injuries or loss from "any other source" under R.C. 2744.05(B)(1). *See Buchman,* 73 Ohio St.3d 260, 652 N.E.2d 952 (1995), at paragraph two of the syllabus ("Social Security and Medicare benefits are the type of collateral source benefits contemplated by R.C. 2744.05(B).") MetroHealth was entitled to a complete offset of the entire $500,000 award of past economic damages under R.C. 2744.05(B)(1).

## C. Future Economic Loss

{¶34} At trial, Stewart's attorneys argued that her son's future economic damages consisted of two parts: (1) lost future income, and (2) expenses associated with a life care plan. An economist testified at trial that the amount of the child's lost income depended upon his level of education: if Stewart's son attended college but did not earn a four-year

degree, he could have expected to earn between $2.3 million to $2.9 million over his statistical work life expectancy; if he only obtained a high school diploma, he could have expected to earn $1.7 million to $2.1 million over his work life expectancy.

{¶35} The experts also proposed a "life plan" for the child's future care. The life plan was designed to predict the child's medical needs for the rest of his life specific to his brain injury and allocate the appropriate financial resources to address those needs. The plan considered the child's need for medical surveillance (health maintenance), spasticity management (to relieve tightness in his joints), therapeutic modalities, counseling, case management, transportation, housing, equipment and supplies, and attendant care. These needs were assessed based on alternative scenarios for at-home and facility care. The child's economist found the present value of at-home care to be $4.3 million and facility care to be $8.2 million. The jury awarded $8 million for future economic damages.

{¶36} In its ruling on MetroHealth's motion to offset future economic damages, the court held that the $8 million in damages "correspond to the same categories of future care recommended by Plaintiff's expert, [so] this court will not be left to speculate as to the damages that must be set off." On that basis, the court found that the entire $8 million award for future damages was subject to offset under R.C. 2744.05(B)(1).

{¶37} The court erred because it could not have concluded to a reasonable degree of certainty that the $8 million award for future economic damages comprised only the

life care plan. The court failed to consider the possibility that at least some part of the $8 million award consisted of lost future wages.

{¶38} Before addressing Stewart's argument, we first address MetroHealth's assertion that Stewart cannot argue that the $8 million award may have contained a loss of future income component because she limited the scope of her claims for future economic damages "to what can be fixed or what can be replaced with services or equipment or medication." MetroHealth argues that loss of future income is not something that can be "fixed" or "replaced with services, equipment, or medication." We reject this assertion. During closing argument, counsel for the child asked the jury to award $8 million for the costs of future care and $2 million in lost income. In no sense did Stewart "limit" the request for damages to the cost of future care.

{¶39} The $8 million award for future economic damages closely corresponded to the dollar amount requested by Stewart under "the same categories of future care recommended by Plaintiff's expert[,]" so we understand why the court would conclude that the award consisted solely of damages for the life care plan. But to accept the court's finding that the award consisted entirely of future medical care forces the conclusion that the jury ignored uncontradicted evidence concerning the child's lost future income and decided to award nothing for that loss. While that could have been a possible outcome, it is just as likely that the $8 million award consisted of an amount for the life care plan and lost future income. The two life care plans presented to the jury valued at-home care at $4.3 million and facility care at $8.2 million. While counsel for

Stewart asked the jury to award $8 million for the life care plan, the jury may have assigned a middle value to the life care plan consistent with testimony by one of the child's experts who testified that the child would not necessarily have to enter facility care immediately, but was of the firm opinion that the child would have to enter facility care at some future point in time. That the possibility exists that the jury could have determined the amount of damages in that fashion takes the court's finding out of the realm of what is reasonably certain for purposes of offset.

{¶40} The uncertainty present in apportioning the $8 million award is the result of there being no interrogatories to determine the specific composition of the award for future economic damages. Of course, neither party was required to request more specific interrogatories, but a political subdivision like MetroHealth that makes it known it intends to seek a post-trial offset for collateral benefits chooses to forego offering specific interrogatories at its own peril. MetroHealth, as the party seeking an offset under R.C. 2744.05(B)(1), had the burden of showing its entitlement to offset. *Buchman*, 73 Ohio St.3d 260, 652 N.E.2d 952 (1995), at paragraph five of the syllabus.

{¶41} Stewart argues that MetroHealth's failure to offer specific interrogatories in this case means that no offset whatsoever can be made. We implicitly rejected this argument in *Jontony v. Colegrove*, 2012-Ohio-5846, 984 N.E.2d 368 (8th Dist.), where we considered a similar case in which a political subdivision sought an R.C. 2744.05(B)(1) offset of a $250,000 award for combined "lost wages and loss of services." The political subdivision sought offset based on Jontony's receiving or being entitled to

receive Social Security disability benefits that would exceed the jury award. Noting that the damages award did not apportion the specific amount allocated to either lost wages or loss of services, we held that the general jury award "fail[ed] to sufficiently separate lost wages and loss of services to determine what amount the jury apportioned for 'lost wages' and 'loss of services.'" *Id*. at ¶ 50. We agreed, however, that evidence offered at trial allowed the trial court to determine lost wages from lost services given evidence that Jontony's expert testified to a specific dollar amount of lost services suffered by Jontony. *Id*. at ¶ 53. That evidence permitted the trial court to deduct those lost services from the overall award, with the remaining amount constituting lost wages that could be offset by Social Security disability benefits. *Id*. at ¶ 54.

**{¶42}** *Jontony* dispels Stewart's contention that the failure to offer specific interrogatories means that nothing can be offset from the award of future economic damages, although it does support her contention that a failure to submit interrogatories reducing the constituent parts of an economic damages award to specific dollar numbers can be an impediment to offset. We found that Jontony offered proof of "loss of services" — a category of loss that was not subject to offset — in the amount of $210,141. *Id*. at ¶ 52. We thus deducted that amount from the $250,000 award to find that the remainder — $48,849 — could be attributed to lost wages and subject to offset. *Id*. at ¶ 55.

**{¶43}** Left unstated in *Jontony* was the amount of damages requested for loss of income in that case. This is important because a stated amount could have affected the

offset. For example, suppose that in addition to the $210,000 requested for loss of services, Jontony asked for an additional award of $200,000 for loss of income, yet the amount awarded totaled $250,000. In this example, it could not be said with the same degree of reasonable certainty that the award for loss of services made up the bulk of the total damages award.

{¶44} That hypothetical is similar to the fact pattern currently before us. We resolve the dilemma by considering the extraordinary statutory purpose behind R.C. 2744.05(B)(1) in conjunction with the consequences attendant to a political subdivision's failure to inquire into the specific composition of a damages award. R.C. 2744.05(B)(1) is extraordinary because the right to offset cannot be waived — if a claimant receives or is entitled to receive benefits for injuries or loss from any source, "the benefits shall be disclosed to the court, and the amount of the benefits *shall be deducted* from any award against a political subdivision recovered by that claimant." (Emphasis added.) But the right to offset is contingent on there being an amount for a collateral benefit "actually included in the jury's award." *Buchman*, 73 Ohio St.3d 260, 652 N.E.2d 952 (1995), at paragraph four of the syllabus.

{¶45} The award of $8 million for future economic damages could have contained, at a minimum, $1.7 million for loss of future income. That is the lowest amount for loss of income suggested by the child's economist. Stewart argues that the child should be entitled to a finding that the jury could have awarded as much as $2.9 million for loss of future income: that figure representing the highest amount for loss of income in the range

set forth by the economist. As we previously noted, at trial, counsel for the child asked the jury to award $8 million for the life care plan and $2 million for lost wages. Counsel also stated to the jury that it could award more or less than the amounts requested.

{¶46} The parties agree that the child will not receive any qualifying benefits for loss of future income, so any amount that the jury could have awarded for lost wages is not subject to any setoff. We conclude that the court should have excluded at least $1.7 million in lost future income from its consideration of the amount to be offset pursuant to R.C. 2744.05(B)(1). Stewart's expert offered a range of possible income loss, and $1.7 million was the minimum amount offered into evidence. We come to the decision to exclude this amount from offset for two reasons: first MetroHealth did not contest any of the expert's calculations for lost future income; second, excluding from offset the minimum amount that the jury could have awarded based on the evidence best effectuates the statutory intent behind R.C. 2744.05(B)(1) to preserve fiscal resources.

{¶47} Of course the jury could have awarded more than the $1.7 million based on the expert testimony. But it also could have awarded less based on counsel's proviso that the jury could award more or less than the amount requested. Without the benefit of jury interrogatories, neither Stewart nor MetroHealth can be heard to complain that the figure at which we have arrived should be any different. We therefore exclude $1.7 million from offset. The remaining $6.3 million would then consist of compensation for the life care plan and was subject to offset.

**{¶48}** The next question we consider is whether the court erred by offsetting the damage award based on the child's present and future access to Social Security and Medicaid benefits.

**{¶49}** There appears to be no genuine dispute that, upon reaching 20 years of age, the child's medical expenses will be paid in full by Medicare. The court found that to the extent that Stewart's son is eligible for benefits upon reaching age 20, MetroHealth is entitled to an offset for those benefits directly paid by Medicare.

**{¶50}** Stewart argues that the court erred by offsetting future benefits because the continued viability of Medicare is subject to political whim, so it was not a benefit that could be said to be reasonably certain to exist in the future. While the vagaries of politics sometimes give rise to concerns about the continued existence of social welfare programs, Stewart gives no plausible basis for us to conclude that Medicare will cease to exist in the near future. Her argument attempts to show that the court could not determine, to the requisite degree of reasonable certainty, MetroHealth's entitlement to an offset by casting doubt on the future of certain social welfare programs. Accepting Stewart's argument at face value would effectively bar all offsets because of the possibility that government programs might, someday, end. Receiving, or being eligible to receive, such benefits are at the heart of R.C. 2744.05. Accepting Stewart's argument would effectively nullify the statute.

**{¶51}** We also reject Stewart's assertion that the size of the damage award in this case might affect her son's eligibility for Social Security or Medicaid. It is true that her

son's entitlement to future Medicaid benefits is complicated by the damages award — Medicaid is a needs-based program and the multi-million dollar damages award would easily render him ineligible. A person in the child's position has the option of creating a special needs trust that would place the damage award in trust in a way that would not affect his eligibility for Medicaid benefits. As we understand it, the trust would be established by the probate court and used for necessities not provided by Medicaid. Upon the death of the trust beneficiary, Medicaid would be entitled to seek reimbursement for Medicaid expenses from the trust corpus.

{¶52} Stewart's argument, however, about the continued eligibility for Medicaid is irrelevant because the court did not fashion its ruling based on her son's continued eligibility for Medicaid. The parties agreed that upon reaching 20 years of age, the child would qualify for Medicare benefits, regardless of his financial need. R.C. 2744.05(B)(1) provides for offset not on the basis of the amount of damages awarded, but on the claimant receiving or being entitled to receive benefits for injury or loss from "any other source." The child's disability qualifies him to receive governmental benefits. For purposes of R.C. 2744.05(B)(1), those benefits exist in isolation from monetary eligibility requirements. This conclusion is compelled by Stewart's argument relating to a special needs trust: if the child can establish the special needs trust, he will receive the government benefits. So he is entitled to receive those benefits regardless of his financial situation and the statute permits an offset.[3]

---

[3] At the post-trial hearing, Stewart tried to show that the Probate Division of the Cuyahoga

**{¶53}** It follows that eligibility for benefits is something that has to be considered without reference to any award entered against a political subdivision. *Buchman* reinforces this conclusion by referring to collateral benefits, "to the extent they can be determined" that are subject to offset. *Buchman*, 73 Ohio St.3d 260, 652 N.E.2d 952, at paragraph three of the syllabus. In this case, the parties appear to agree that absent any damage award, the child would continue to be eligible for benefits.

**{¶54}** With the child's eligibility for future health benefits established starting when he turns 20, the court found, consistent with evidence heard at the post-trial hearing, that "Medicare covers 80% of customary and ordinary care." This fact caused the court to exclude from offset 20 percent of the total award.

**{¶55}** The court next considered the eight-year period starting with the child's age at the time he received the damage award (12 years) and his eligibility for Social Security at age 20. The court ruled that even if the child was not covered by Medicaid during this interim period because the damage award rendered him ineligible, he could obtain health insurance from the federal government. The court determined that the maximum amount of the child's premium for health care would be $8,000 per year, with a maximum out-of-pocket expense of $6,500 per year. Multiplying those expenses over the eight-year period, the court determined that the most the child would spend in the

County Court of Common Pleas has in the past refused to establish special needs trust and that it was unclear whether any court in Ohio had established that kind of trust with a similarly sized damages award. Whether this is true or not has no effect on our conclusion that it is the disability itself that qualifies the child for benefits.

eight-year period for medical expenses would be $116,000 ($8,000 + $6,500 x 8 = $116,000).

{¶56} Stewart does not dispute the court's conclusion that the child could obtain health insurance from the federal government or its calculation of the maximum out-of-pocket expense for that insurance. She does argue that Medicaid, Medicare, and the Affordable Care Act are political targets subject to privatization, budget cuts, and even repeal, but those are the same arguments we earlier rejected and need not repeat.

{¶57} Finally, the court recognized that some categories of the life care plan for transportation, home care, and housing should be separated from the statutory offset in their entirety because they were categories of expenses that were not encompassed by the benefits that the child would receive. Stewart argues that the court erred by finding that the costs for transportation, home care, and housing could be determined with any degree of certainty given that the jury did not return specific interrogatories on those costs. This argument fails to take into account the specific nature of what Stewart requested in her life care plan. That plan gave a specific cost breakdown by category, so the court could find that the jury awarded damages based on those costs and exclude from offset the amounts requested. Stewart maintains that the court could not have determined these costs to the requisite degree of certainty because the jury may have intended to provide more money in damages for expenses that were not subject to offset. But that argument is speculation given the very specific nature of those costs contained in the life care plan.

D. Constitutional Challenges

**{¶58}** In her second assignment of error, Stewart raises a number of constitutional challenges to the application of R.C. 2744.05(B)(1) and (C)(1). She argues that R.C. 2744.05 violates due process; denies equal protection of the law; denies the right to a trial by jury; and that legislatively imposed remittiturs violate the doctrine of separation of powers. These challenges have been resolved in some context contrary to Stewart's position notably, in *Oliver v. Cleveland Indians Baseball Co. Ltd. Partnership*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205. In *Oliver*, the Ohio Supreme Court held: "The limit on non-economic compensatory damages in R.C. 2744.05(C)(1) does not violate the right to a jury trial or the right to equal protection under the law." Stewart concedes that *Oliver* rejected facial challenges to R.C. 2744.05, but maintains that she is raising an "as-applied" challenge to R.C. 2744.05. She argues that unlike previous legislative attempts to enact tort reform, the General Assembly failed to include exceptions and allowances in R.C. 2744.05, so that law remains "absolute and uncompromising."

**{¶59}** There are two primary ways to challenge the constitutionality of a statute: by facial challenge or through an "as-applied" challenge. *Harrold v. Collier*, 107 Ohio St.3d 44, 2005-Ohio-5334, 836 N.E.2d 1165, ¶ 37.

**{¶60}** In a facial challenge to the constitutionality of a statute, the claimant must show that there are no set of facts under which the challenged statute is constitutional. An as-applied challenge alleges that a particular application of a statute is unconstitutional. "Facial challenges present a higher hurdle than as-applied challenges

because, in general, for a statute to be facially unconstitutional, it must be unconstitutional in all applications." *State v. Romage*, 138 Ohio St.3d 390, 2014-Ohio-783, 7 N.E.3d 1156, ¶ 7, citing *Oliver* at ¶ 13. In other words, to prevail on a facial challenge, the challenger must establish that there are no set of facts under which a statute might be valid. *Id*.

{¶61} An as-applied challenge, is premised on the challenger's contention that "'application of the statute in the particular context in which he has acted, or in which he proposes to act, [is] unconstitutional.'" *State v. Lowe*, 112 Ohio St.3d 507, 2007-Ohio-606, 861 N.E.2d 512, ¶ 17, quoting *Ada v. Guam Soc. of Obstetricians & Gynecologists*, 506 U.S. 1011, 113 S.Ct. 633, 121 L.Ed.2d 564 (1992) (Scalia, J., dissenting). This type of challenge puts the burden on the challenger to demonstrate "a presently existing state of facts that make the statute unconstitutional under the appropriate level of scrutiny." *Eppley v. Tri-Valley Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401, ¶ 13, citing *Belden v. Union Cent. Life Ins. Co.*, 143 Ohio St. 329, 55 N.E.2d 629 (1944).

{¶62} Regardless of the manner in which the constitutionality of a statute is raised, we employ a strong presumption that the statute is constitutional. *Arbino v. Johnson & Johnson*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, ¶ 25. For this reason, it must appear beyond a reasonable doubt that the statute and constitutional provision are incompatible before a court can declare a statute unconstitutional. *State ex rel. Dickman v. Defenbacher*, 164 Ohio St. 142, 128 N.E.2d 59 (1955), paragraph one of the syllabus.

**{¶63}** Stewart first argues that R.C. 2744.05 violates her right to due process. She maintains that if the court's offset calculations are upheld, her son will recover nothing for his lost earning capacity and will be denied his "fundamental right to a meaningful remedy." Given our disposition of the first assignment of error in which we removed from the offset calculations the minimum amount that the jury might have awarded her son for lost future income, this argument is now moot.

**{¶64}** Stewart next argues that the R.C. 2744.05(C)(1) non-economic damages cap of $250,000 per person violates her right to substantive due process because it is not necessary to "protect political subdivisions from financial ruin." Appellant's brief at 28. She claims that MetroHealth has a "substantial insurance policy paid for at taxpayer expense and sufficient to cover the jury's verdict." *Id*.

**{¶65}** Article I, Section 16 of the Ohio Constitution states: "All courts shall be open, and every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law, and shall have justice administered without denial or delay."

**{¶66}** Broadly stated, substantive due process claims tend to challenge the policy behind legislative enactments. Although the General Assembly has broad power under Article II, Section 1 of the Ohio Constitution to enact legislation ("the legislative power of the state shall be vested in a general assembly"), that authority is not absolute. Due process of law requires all legislation to have a real and substantial relation to the public health, safety, morals, or general welfare and not be unreasonable or arbitrary. *See*

*Mominee v. Scherbarth,* 28 Ohio St.3d 270, 274, 503 N.E.2d 717 (1986); *In re Adoption of H.N.R.*, 145 Ohio St.3d 144, 2015-Ohio-5476, 47 N.E.3d 803, ¶ 25. This is known as the "rational basis" test and it applies unless the challenger argues that the contested legislation implicates a fundamental right. *Eppley*, 122 Ohio St.3d 56, 2009-Ohio-1970, 908 N.E.2d 401 at ¶ 15. Stewart does not assert that R.C. 2744.05 implicates a fundamental right.

{¶67} In *Arbino*, the Ohio Supreme Court rejected a due process constitutional challenge to R.C. 2315.18, a statute that limits compensatory damages for non-economic loss in tort actions. The Supreme Court concluded that "tort reform" as implicated by the limits on compensatory damages for non-economic loss showed "a clear connection between limiting uncertain and potentially tainted noneconomic-damages awards and the economic problems demonstrated in the evidence." *Arbino,* 116 Ohio St.3d, 468, 2007-Ohio-6948, 880 N.E.2d 420 at ¶ 56. The Supreme Court also concluded that the legislature acted neither arbitrarily nor unreasonably by setting limits on non-economic damages because those limits could be obtained "without limiting the recovery of individuals whose pain and suffering is traumatic, extensive, and chronic * * * ." *Id.* at ¶ 61.

{¶68} Stewart makes no convincing argument that R.C. 2744.05 is unreasonable or arbitrary as applied to her and her son. As *Arbino* concluded, an award of non-economic damages does nothing to compromise the compensation that a plaintiff receives for the actual injury caused by the defendant. It has long been understood that non-economic or

punitive damages "go beyond" compensation for injury or loss, *Roberts v. Mason*, 10 Ohio St. 277 (1859), and are designed to "punish the offending party and to set him up as an example to others, thereby deterring others from similar behavior." *Cabe v. Lunich*, 70 Ohio St.3d 598, 162, 640 N.E.2d 159 (1994). However, when a tortfeasor is a political subdivision, that "punishment" is one meted out against all constituents of the political subdivision regardless of individual fault. For this reason, Stewart's argument that the public purse constitutes an "insurance policy" does nothing to advance the argument that R.C. 2744.05 violates substantive due process as applied to her. Whether a political subdivision can afford to pay the entire amount of a non-economic damages award says nothing about why a cap on non-economic damages violates due process as applied to her. The legislature's decision to limit recovery of non-economic damages against political subdivisions in R.C. 2744.05 appears equally as justified as it was in *Arbino*.

{¶69} Stewart also maintains that the application of the non-economic damages cap in R.C. 2744.05(C)(1) violates her right to equal protection of the law as guaranteed under Article I, Section 2 of the Ohio Constitution. She complains that R.C. 2744.05 permits unfair and disparate outcomes where those injured by political subdivision tortfeasors have their non-economic damages capped at $250,000 while those injured by tortfeasors who are not political subdivisions have their non-economic damages capped at $500,000.

{¶70} Equal protection of the law is the constitutional guarantee that no person or group will be denied the protection under the law that is enjoyed by similar persons or groups. *Colgate v. Harvey*, 296 U.S. 404, 422-423, 56 S.Ct. 252, 80 L.Ed. 299 (1935). This is not to say that states cannot, in the exercise of legislative authority, classify persons for the purposes of legislation. A statutory classification made in the proper exercise of police power will be upheld if the classification "bears a rational relationship to a legitimate governmental interest." *Menefee v. Queen City Metro*, 49 Ohio St.3d 27, 29, 550 N.E.2d 181 (1990). However, if the classification involves either a suspect class or a fundamental right, it will be upheld only if the challenged classification serves a compelling state interest and the classification is necessary to serve that interest. *Cleveland v. McCardle*, 139 Ohio St.3d 414, 2014-Ohio-2140, 12 N.E.3d 1169, ¶ 11; *Massachusetts Bd. of Retirement v. Murgia*, 427 U.S. 307, 312, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976).

{¶71} R.C. 2744.05(C)(1) involves neither a suspect class nor a fundamental right, so we again apply the rational basis test to determine if the classification has some reasonable basis. In *Oliver*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, the Supreme Court rejected a facial challenge to R.C. 2744.05(C)(1) on grounds that it violated equal protection, finding that "the damage limits for non-economic harm in R.C. 2744.05(C)(1) are neither unreasonable nor arbitrary, at least with regard to persons suffering noncatastrophic injuries." *Id.* at ¶ 13.

{¶72} Stewart correctly notes that *Oliver* was limited to a facial challenge, but makes no convincing argument why there should be a different result in her as-applied challenge. Indeed, *Oliver* stated, albeit in dicta, that had an as-applied challenge been raised in that case it would have been rejected because R.C. 2744.05(C)(1) does not contain an across-the-board limitation on non-economic damages — the General Assembly could not only have prohibited all awards for non-economic damages, but it could also have prohibited all tort actions against political subdivisions. It follows that it was not arbitrary to allow "*some*" recovery in tort actions against political subdivisions. (Emphasis sic.) *Id*. at ¶ 15.

{¶73} The dicta in *Oliver* alluded to a fundamental principle of governmental immunity — the state has the authority to determine by law the extent to which it and political subdivisions can be held liable for their negligence in the performance or nonperformance of an act. *Haverlack v. Portage Homes, Inc*., 2 Ohio St.3d 26, 29, 442 N.E.2d 749 (1982). If the state can define the scope of claims for which political subdivisions can be sued — including barring all tort actions against political subdivisions — it follows that the state can define the scope of damages for which political subdivisions are liable when it does permit itself to be sued. And to the extent that the damages caps are lower for political subdivisions than they are for private litigants, that difference goes to the rational interest in conserving the fiscal resources of political subdivisions. *Menefee*, 49 Ohio St.3d at 29, 550 N.E.2d 181; *Lewis v. Cleveland*, 89 Ohio App.3d 136, 139, 623 N.E.2d 1233 (8th Dist.1993).

**{¶74}** Stewart next complains that the court's application of R.C. 2744.05 violates her son's right to a trial by jury under Article I, Section 5 of the Ohio Constitution ("The right of trial by jury shall be inviolate, except that, in civil cases, laws may be passed to authorize the rendering of a verdict by the concurrence of not less than three-fourths of the jury.").

**{¶75}** The specific nature of Stewart's right-to-trial argument is obscure: she cites R.C. 2744.05(C), a section that caps non-economic damages, but in the same paragraph of her brief complains that the court acted without the benefit of *Buchman* interrogatories to engage in fact-finding that overrode the jury's constitutionally protected authority, an argument that implicates the offset for economic damages under R.C. 2744.05(B)(1).

**{¶76}** Any argument that the R.C. 2744.05(C)(1) cap on non-economic damages violates the right to a trial by jury is meritless. In *Arbino*, the Supreme Court denied a similar challenge to R.C. 2315.18 caps on non-economic damages entered against private litigants on grounds that the caps violated the right to a trial by jury. The Supreme Court noted that courts have historically been allowed to alter a jury's award of damages: an award can be decreased by remittitur or increased by additur based on the cause of action from which the award originates. *Id.*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 38-39. Why a statutory decrease in damages should be treated differently from a statutory increase in damages is unexplained. *Id.* at ¶ 39.

**{¶77}** Although *Arbino* considered the application of R.C. 2315.18(C), the rationale for the holding in that case is equally applicable to R.C. 2744.05(C). The two

statutes are so similar in form and purpose that the minor differences between them are inconsequential. On authority of *Arbino*, we find that the cap on non-economic damages contained in R.C. 2744.05(C) does not violate the right to a trial by jury.

{¶78} We likewise reject the argument that the offset required by R.C. 2744.05(B)(1) violates the right to a trial by jury. In our discussion of the procedure to be followed by the court when addressing an R.C. 2744.05(B)(1) claim for offset, we concluded that the statute requires a post-trial proceeding in which the court examines the benefits for injuries or loss that a plaintiff has received from insurance or any other source. This post-trial proceeding does not involve any alteration of the jury's award — the court merely examines the jury award to determine "the extent that the loss for which it compensates is actually included in the jury's award." *Buchman*, 73 Ohio St.3d 260, 652 N.E.2d 952, at paragraph four of the syllabus. This offset is applied only to the extent that the court can find with a reasonable degree of certainty that collateral benefits are deductible from the jury's verdict against a political subdivision. The reasonable degree of certainty required before an offset can be made ensures that the court does not violate the jury's fact-finding function. The offset itself is nothing more than a mechanical deduction that has no relevance to the jury's function.

{¶79} Finally, Stewart argues that R.C. 2744.05 violates Article II, Section 32 of the Ohio Constitution ("The general assembly shall grant no divorce, nor exercise any judicial power not herein expressly conferred") and its recognition of the separation of

powers principle because it legislatively forces a judicial remittitur in any non-economic damage award in excess of $250,000 against a political subdivision.

**{¶80}** It is unclear whether Article II, Section 32 of the Ohio Constitution provides a basis for a separation of powers argument. In *S. Euclid v. Jemison*, 28 Ohio St.3d 157, 158-159, 503 N.E.2d 136 (1986), the Supreme Court stated that "Ohio, unlike other jurisdictions, does not have a constitutional provision specifying the concept of separation of powers[.]" But in *Arbino*, the Supreme Court addressed a separation of powers argument under Article II, Section 32 of the Ohio Constitution. *Arbino*, 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 73-76. Just three years later, however, in *State v. Bodyke*, 126 Ohio St.3d 266, 2010-Ohio-2424, 933 N.E.2d 753, the Supreme Court quoted with approval the language in *Jemison,* that Ohio does not have a constitutional provision specifying the concept of separation of powers. *Id*. at ¶ 42.[4]

**{¶81}** The discrepancy is of no consequence because the Supreme Court has determined that the doctrine of separation of powers "is implicitly embedded in the entire framework of those sections of the Ohio Constitution that define the substance and scope of powers granted to the three branches of state government." *Jemison* at 159. In *State v. Hochhausler*, 76 Ohio St.3d 455, 463, 668 N.E.2d 457 (1996), the Supreme Court found that the principle of separation of powers is "embedded" and "inherent" in the constitutional framework of Ohio's state government. So we consider Stewart's

---

[4] In well over 100 cases addressing the separation of powers, Article II, Section 32 of Ohio Constitution has been cited only eighteen times by the Ohio Supreme Court (one of those cites appeared in a dissenting opinion).

separation of powers argument not in the context of Article II, Section 32 of the Ohio Constitution, but under well-established precedent interpreting the inherent divisions of power under tripartite systems of government.

{¶82} What we earlier stated about the legislature's ability to limit damages awards against political subdivisions applies with equal force to Stewart's separation of powers argument — if the General Assembly can limit the ways in which political subdivisions can be sued, it can likewise limit the amount of damages those political subdivisions might have to pay. *Oliver*, 123 Ohio St.3d 278, 2009-Ohio-5030, 915 N.E.2d 1205, at ¶ 7-8. While *Oliver* specifically rejected the argument that the R.C. 2744.05(C)(1) caps on compensatory damages violated the right to a trial by jury, Stewart offers no reason why that case would not control over the issue of whether the damages cap violates the separation of powers. If the legislature does not usurp the role of the trier of fact by imposing damages caps, it cannot usurp the role of the trial judge by imposing damages caps.

## E. Summary

{¶83} To summarize our holding thus far with respect to the issues raised in the appeal: even though the jury returned general awards for future economic damages, the court could not assume for purposes of determining the statutory offset that the jury intended to disregard substantial and uncontradicted evidence going to the child's loss of future income and award damages for the life care plan only. Because loss of future income could have been a part of future economic damages, the court could not have

determined to the requisite degree of certainty that the entire award should be offset. The evidence showed that $1.7 million was the minimum amount of lost wages that could have been awarded, so we add that amount to the $3.451 million award entered by the court, for a total award of $5.151 million. On remand, the court shall enter judgment accordingly. Stewart's remaining arguments are overruled.

## II. The Cross-Appeal

**{¶84}** MetroHealth filed a "conditional" cross-appeal, asking us to consider its cross-assignments of error only in the event that we reverse or modify that part of the court's judgment granting its motion for offset of collateral benefits under R.C. 2744.05(B). Because we have modified the court's judgment in part with respect to future economic damages, we address the cross-assignments of error.

**{¶85}** MetroHealth first complains that the court erred as a matter of law by denying its motion for a new trial. It raises three issues in this cross-assignment of error: that the court erred by determining that an unborn fetus has an independent claim for lack of informed consent; that the court erred by allowing Stewart to withdraw the videotaped cross-examination of MetroHealth's treating neonatologist after the parties agreed to preserve that witness's testimony by videotape; and that the judgment is against the weight of the evidence.

**{¶86}** The first two issues asserted in this cross-assignment of error are raised under Civ.R. 59(A)(9) and complain that the court erred as a matter of law. We review those issues de novo. *See Ferguson v. Dyer*, 149 Ohio App.3d 380, 2002-Ohio-1442,

777 N.E.2d 850, ¶ 10 (10th Dist.). The third issue in this cross-assignment of error is raised under Civ.R. 59(A)(6) and complains that the verdict is against the manifest weight of the evidence. We review that issue for an abuse of discretion. *Zappola v. Rock Capital Sound Corp.*, 8th Dist. Cuyahoga No. 100055, 2014-Ohio-2261, ¶ 65.

### A. Lack of Informed Consent

**{¶87}** The third count of Stewart's complaint alleged that Dr. Weight and MetroHealth were negligent when they failed to disclose to her son the material risks and dangers associated with vaginal delivery in light of Stewart's obstetric history, prenatal course, risk status, and fetal monitoring during labor. MetroHealth filed a partial motion for summary judgment on the informed consent claim relative to the child, arguing that an unborn fetus had no independent claim for lack of informed consent.[5] The court denied summary judgment, holding that "an unborn minor has a claim for lack of informed consent when a physician fails to obtain informed consent from the minor's mother." MetroHealth argues that the court erred in this respect because Ohio has never recognized an unborn fetus's independent claim for informed consent based on what was or was not disclosed to the fetus's mother during labor and delivery.

**{¶88}** At the outset, we consider Stewart's argument that MetroHealth's cross-assignment of error relating to informed consent is barred by the "two-issue" rule. She maintains that the jury found the defendants liable on two counts — negligence and

---

[5] The court granted summary judgment to MetroHealth on Stewart's identical claim of lack of informed consent because the statute of limitations for her claim had run. Stewart did not appeal that ruling.

lack of informed consent — and that even if MetroHealth prevails on its informed consent argument, the negligence verdict would remain unaffected.

**{¶89}** The two-issue rule states that there is no reversible error when an error relates to one claim or defense and the verdict does not reveal whether the appellee prevailed on that basis or another not affected by the error. *Sites v. Haverstick*, 23 Ohio St. 626 (1873), paragraphs one and two of the syllabus. The two-issue rule "does not apply where there is a charge on an issue upon which there should have been no charge." *Ricks v. Jackson*, 169 Ohio St. 254, 159 N.E.2d 225 (1959), paragraph four of the syllabus. If the court does charge on an issue for which there should not have been a charge, "prejudice is generally presumed." *Wagner v. Roche Laboratories*, 85 Ohio St.3d 457, 461, 709 N.E.2d 162 (1999). *See also Hampel v. Food Ingredients Specialties*, 89 Ohio St.3d 169, 185-186, 729 N.E.2d 726 (2000). MetroHealth argues that Ohio does not recognize an unborn minor's claim for lack of informed consent. That is an argument going to whether there should have been any charge at all on the issue of informed consent. It thus falls under the *Ricks* exception to the two-issue rule and can be heard on appeal.

**{¶90}** In *Nickell v. Gonzalez*, 17 Ohio St.3d 136, 477 N.E.2d 1145 (1985), the syllabus states the elements of a claim for lack of informed consent:

> The tort of lack of informed consent is established when:
> (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any;

(b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and

(c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy.

**{¶91}** The only Ohio case to mention whether an unborn child can bring an informed consent claim is *Diekman v. R. Les Murray & Samaritan Ob/Gyn*, 1st Dist. Hamilton No. C-000467, 2001 Ohio App. LEXIS 4588 (Oct. 12, 2001). In *Diekman*, the First District Court of Appeals considered the dismissal of a viable fetus's informed consent claim premised on a doctor's use of forceps during the birthing process. The appellate court affirmed both the dismissal of the informed consent claim and the court's refusal to instruct the jury on informed consent, finding that the plaintiff offered no "testimony relating to whether the appropriate standard of care required obtaining informed consent from an unborn for the use and application of forceps." *Id*. at 9. The court went on to note that the plaintiff "has not provided, and we are not aware of, any statutory or common-law basis for an unborn to bring an informed-consent claim." *Id*. at 10.

**{¶92}** We disagree with MetroHealth's argument that *Diekman* "rejected" a cause of action for an unborn child's claim for lack of informed consent. The primary holding in *Diekman* was that there was no evidence to support the claim even if it existed. The court of appeals thus bypassed any direct discussion of whether the informed consent

claim existed. Its passing comment — that it was unaware of any statutory or common law basis for an unborn child's claim for lack of informed consent — was in the nature of a parenthetical, not a direct holding. That the court was aware of no statute or case decision that specifically acknowledged an unborn child's right to a cause of action for lack of informed consent is not the same as a definitive statement that the cause of action does not exist.

{¶93} MetroHealth also argues that in *Hester v. Dwivedi*, 89 Ohio St.3d 575, 733 N.E.2d 1161 (2000), the Supreme Court held that decisions related to the course of pregnancy and delivery comprise a legal right that belongs to Stewart, to the exclusion of the unborn child.

{¶94} *Hester* was a "wrongful life" case. The parents of a child born with spina bifida and other complications brought an action in their own name and on behalf of their child, alleging that the defendant medical doctors did not adhere to the required standards of care when they failed to inform the plaintiffs that prenatal tests showed positive factors indicating that the child had birth defects. The trial court granted a motion for judgment on the pleadings with respect to the child's cause of action for "wrongful life" on grounds that Ohio did not recognize a child's claim for wrongful life (the parents' negligence claims were allowed to stand). On appeal, the Supreme Court stated the issue as whether "a child may recover damages for the 'injury' of having been born." *Id*. at 579. After noting that "the vast majority of jurisdictions that have considered wrongful life claims

similar to [the child's] have refused to recognize them," *id*. at 581, the Supreme Court

stated:

> It is undisputed that [the child's] spina bifida condition commenced at or near the time of conception, and that appellees neither caused that condition itself, nor could they have treated either [the mother] or [the child] so as to allow [the child] to be born without spina bifida. Thus, the only injury causally related to the appellees' breach of duty was the deprivation of the chance to make a fully informed decision whether to continue the pregnancy. That decision, legally, belonged to [the mother]. *Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973). Had she been given the information at issue she would have had two options: continue the pregnancy or abort the pregnancy.

*Id*.

{¶95} Contrary to MetroHealth's assertion, *Hester* does not rest on the principle

that an unborn child has no cause of action for lack of informed consent. The Supreme

Court made clear that the mother's "depravation of opportunity to make an informed

choice to terminate a pregnancy" was different from the birth defects claimed as an injury

by the child. *Id*. at 583. The Supreme Court did not hold that an unborn child has no

cause of action for lack of informed consent, but that under the facts of the case, the issue

of informed consent had been raised only by the mother.

{¶96} With there being no binding precedent directly on point, we consider first

principles in addressing the issue of whether a cause of action exists for an unborn child's

claim for lack of informed consent.

{¶97} The general rule for harm caused to an unborn child is stated in 2

Restatement of Law 2d, Torts, Section 869(1) (1979): "One who tortiously causes harm to

an unborn child is subject to liability to the child for the harm if the child is born alive."

**{¶98}** This general rule must be construed in light of Article I, Section 16 of the Ohio Constitution, which states that "every person, for an injury done him in his land, goods, person, or reputation, shall have remedy by due course of law * * *." Is an unborn child a person for purposes of seeking a legal remedy? The law relative to the rights of succession generally held that "a child *en ventre sa mere* [in utero], as to every purpose for the benefit of the child, is to be considered *in esse* [in being], though this rule is not applied unless the benefit and interest of the child will thereby be promoted." *Evans v. Anderson*, 15 Ohio St. 324, 326 (1864). And in the context of tort actions, *Williams v. Marion Rapid Transit, Inc.*, 152 Ohio St. 114, 87 N.E.2d 334 (1949), stated at paragraph two of the syllabus:

> Injuries wrongfully inflicted upon an unborn viable child capable of existing independently of the mother are injuries "done him in his * * * person" within the meaning of Section 16, Article I of the Constitution and, subsequent to his birth, he may maintain an action to recover damages for the injury so inflicted.

**{¶99}** Key in this analysis is the viability of the child, for a nonviable fetus is not a distinct human entity with rights that can be enforced. For example, an unborn child's right to recover for injuries suffered in utero has been established under the wrongful death statute, R.C. 2125.01, and that right applies even if the child is stillborn. *See, e.g.*, *Jasinsky v. Potts*, 153 Ohio St. 529, 92 N.E.2d 809 (1950), syllabus (holding that under the wrongful-death statute the administrator of the estate of a child who, while viable, suffered a prenatal injury through the alleged negligent act of another and who died after birth has a cause of action against such other for damages for the benefit of the parents of

such infant). In *Werling v. Sandy*, 17 Ohio St.3d 45, 476 N.E.2d 1053 (1985), the Ohio Supreme Court took *Jasinsky* a step further to rule that "[a] viable fetus which is negligently injured *en ventre sa mere* and subsequently stillborn may be the basis for a wrongful death action pursuant to R.C. 2125.01." *Id.* at syllabus. In other words, the deciding factor was not live birth, but the viability at the time of the injury.

{¶100} MetroHealth does not dispute that a viable, unborn child has an independent right to seek redress for injury caused by negligence. Moreover, it does not dispute for purposes of this case that the child was viable at the time he suffered his injury caused by the lack of informed consent.[6] MetroHealth argues, however, that Ohio has never recognized an independent claim for informed consent as to what was or was not disclosed to a child's mother during her labor and delivery. While no Ohio court has expressly recognized the right, courts in other jurisdictions have.

{¶101} *Shack v. Holland*, 89 Misc.2d 78, 389 N.Y.S.2d 988 (1976), was arguably the first case to find that a viable, unborn fetus could assert an independent claim for lack of informed consent. The court first noted that New York recognized an unborn child's right to maintain an action for prenatal injuries. *Id.* at 82. The court next noted that New York law did not treat a lack of informed consent as a battery, but had opted for a "negligence approach" in which the torfeasor's actions were viewed under a standard of

---

[6] R.C. 2919.16(M) defines "viable" as the stage of development of a human fetus where "there is a realistic possibility of the maintaining and nourishing of a life outside of the womb with or without temporary artificial life-sustaining support." That the child has survived injuries suffered just prior to and during his birth conclusively establishes his viability.

professional conduct.[7]  *Id*. at 85.  Acknowledging that New York recognized that an unborn child had a cause of action for lack of informed consent and that the duty to disclose foreseeable risks were grounded in negligence, the court framed the question as whether an unborn child has a cause of action for lack of informed consent via the mother of the child.  *Id*. at 85.  The court found that "although the obligation to disclose runs to the mother," the unborn child "comes within the area of persons to be protected."  *Id*.  It concluded:

> The lack of informed consent of the mother would have its effect upon the fetus to be born for good or ill.  A child in its mother's womb is a foreseeable circumstance.  Conduct, which creates a risk of harm to a woman, includes also a risk of harm to her unborn child.  The standard of care imposed upon the doctor by the statute inures to the benefit of her unborn child.  This is a classic example of derivative liability whereby a plaintiff may institute an action to redress a wrong done to himself which is proximately caused by a wrong done to another.

*Id*.

{¶102} In *Hughson v. St. Francis Hosp*., 92 A.D.2d 131, 459 N.Y.S.2d 814 (1983), the appellate division of the Supreme Court of New York affirmed the underlying premise in *Shack*, with one notable exception: it clarified that the "derivative liability"

---

[7] At one time, courts viewed a claim of lack of informed consent as a battery.  *See, e.g.*, *Lacey v. Laird*, 166 Ohio St. 12, 139 N.E.2d 25 (1956), paragraph two of the syllabus ("Even though a surgical operation is beneficial or harmless, it is, in the absence of a proper consent to the operation, a technical assault and battery for which the patient may recover damages, but only nominal damages, and the surgeon is entitled to have the jury so instructed.").  A theory of informed consent as a battery is problematic for an unborn child because one of the elements of a battery is a "harmful contact."  *Love v. Port Clinton*, 37 Ohio St.3d 98, 99, 524 N.E.2d 166 (1988).  *Nickell,* 17 Ohio St.3d 136, 477 N.E.2d 1145, revised that law and made lack of informed consent an independent tort.

referred to by *Shack* did not use the term "derivative" in "the strict legal sense[.]" The Supreme Court noted that because a child is not legally competent to consent to medical services, "[i]t is the parent who gives effective consent * * * notwithstanding that it is the child who is the 'patient.'" *Id.* at 135.

{¶103} This approach has been adopted in other jurisdictions. For example, in *Roberts v. Patel*, 620 F.Supp. 323 (N.D.Ill.1985), the district court construed the strong policy that Illinois had favoring the protection of a fetus and the protectable interest the fetus had in ordinary malpractice claims to hold that a pregnant mother's physicians owed a duty of informed disclosure not only to the mother, but also to the child. *Id.* at 326. The district court found that the risks attendant to the mother's treatment (the child's mother, in labor, had been told that a Caesarean section should not be performed and that her labor "should be temporarily halted by use of alcohol and other drugs"), "flowed primarily to the infant." *Id.* *See also Draper v. Jasionowski*, 372 N.J.Super. 368, 858 A.2d 1141 (Super.App.Div.2004) (holding that "New Jersey recognizes an independent cause of action on behalf of an infant, on reaching majority, against the child's mother's obstetrician, for prenatal injuries caused by the child's vaginal delivery, arising out of the failure of the physician to obtain the child's mother's informed consent, prior to the child's delivery."); *Morgan v. Olds*, 417 N.W.2d 232 (Iowa App.1987) ("when a doctor fails to obtain the consent of the incompetent patient's surrogate decision maker, he breaches his duty to the patient and is liable for any resultant damages."); *Burgess v. Superior Court*, 2 Cal.4th 1064, 9 Cal.Rptr.2d 615, 831 P.2d 1197 (1992) (noting that any

treatment for an unborn child necessarily implicates the mother's participation since access to the baby could only be accomplished with the mother's consent and with impact to her body).

{¶104} The case relied on by the court below, *Miller v. Dacus*, 231 S.W.3d 903 (Tenn.2007), held, similar to the above-cited authority, that an unborn child has a claim for lack of informed consent when a physician fails to obtain informed consent from the child's mother. *Miller* noted that Tennessee law established two "clear" principles: "(1) that a minor can recover for prenatal injuries caused by the negligence of another, and (2) that a minor has an independent action for lack of informed consent against a medical provider." (Citations omitted.) *Id.* at 909. *Miller* noted that regardless of whether a minor's injuries were prenatal or postnatal, the minor would be unable to consent in either circumstance, so "effective consent must be obtained from a parent or guardian." *Id.* The *Miller* court found it would be "arbitrary to allow a minor to recover for injuries sustained ten minutes after delivery and to prohibit a minor to recover from injuries sustained ten minutes before delivery." *Id.* It thus held that "a minor does have an independent action against a medical provider based on lack of informed consent for prenatal injuries suffered during labor and delivery." *Id.* at 911.

{¶105} MetroHealth challenges the logic behind *Miller* (and presumably the similar cases issued from other jurisdictions) on grounds that it conflates informed consent with medical negligence by confusing the duty to disclose in an informed-consent claim with the duty to render medical treatment consistent with the applicable standard of

care, whether before or after birth. It maintains that a physician does not owe an unborn child any duty to inform and the child's claims in this case are nothing more than medical malpractice claims.

{¶106} It seems to us that it is MetroHealth that is conflating causes of action in this case. As in *Miller*, there are two givens under Ohio law: unborn, viable children have the legal right to seek redress for injuries caused *in utero* and there is an independent tort claim based on the lack of informed consent. These givens lead to the question of whether an unborn, viable child can bring an independent claim for lack of informed consent when the child's mother grants consent *on behalf of the child* based on information provided to her. We answer that question in the affirmative because if the cause of action exists for a child, it must exist both prenatally and postnatally. And if an unborn, viable child has the general right to seek redress for injuries suffered *in utero*, the cause of action for lack of informed consent must also be available to him.

{¶107} MetroHealth argues that the duty to inform is not divisible between a mother and a child *in utero*, but fails to explain why there should be a different rule for injuries suffered *in utero* versus those suffered postnatally. We do not understand MetroHealth to argue that a child has no viable claim for a lack of informed consent occurring after birth. Assuming the injury occurred at an age where the child lacked the legal ability to consent, it would be the child's parent or guardian who gave consent. But at all events, it would be an injury done to the child because the parent or guardian is merely the conduit through which the child's consent flows. Both Stewart and her son

have similar, but independent, claims for lack of informed consent. The court did not err by allowing the jury to consider the child's informed consent claim.

{¶108} The complaint alleged that a reasonable person in Stewart's position who received adequate informed consent would not have elected to proceed with a vaginal delivery and that undisclosed risks and dangers attendant to a vaginal delivery proximately caused the child's injuries. The jury answered interrogatories finding that the defendants failed to inform the child of the material risks and dangers associated with his care and delivery, that the risks and dangers that should have been revealed actually occurred and were a direct cause of injury to the child, and that a reasonable person in the child's position would have decided against the proposed care if the material risks and dangers had been disclosed prior to the care. This verdict was consistent with a claim for lack of informed consent.

### B. Cross-Examination

{¶109} Prior to trial, MetroHealth identified as a witness a neonatologist who treated the child after his birth. The neonatologist had been deposed on both direct and cross-examination during discovery. Stewart sought, by motion in limine, to exclude the witness because she anticipated that MetroHealth would attempt to elicit opinion testimony from the neonatologist without filing a report as required by Loc.R. 21.1. The court granted the motion in part to limit the witness to testimony as a treating physician. The neonatologist was unavailable to testify at trial, so the parties played his deposition for the jury. However, at the close of the direct testimony, Stewart asked the court to

allow her to withdraw the cross-examination of the witness. The court granted the motion over MetroHealth's objection.

{¶110} Although the parties frame their arguments in this cross-assignment of error as whether the neonatologist would be testifying solely as a fact witness or would be giving opinions that were not previously disclosed, we think the actual issue is whether a party has the obligation to cross-examine a witness.

{¶111} In criminal cases, defense counsel is not obligated to cross-examine every witness the prosecution calls. *State v. Otte*, 74 Ohio St.3d 555, 565, 660 N.E.2d 711 (1996). There is no reason why a different rule would apply in a civil case. Had the neonatologist appeared at trial as a witness for MetroHealth, Stewart would have been under no obligation to cross-examine him. That the parties agreed that the neonatologist would testify by videotaped deposition testimony did not change Stewart's ability to decide to not have the witness's cross-examination presented to the jury. The court did not err.

### C. Weight of the Evidence

{¶112} MetroHealth's third argument complains that the jury's verdict is against the manifest weight of the evidence. It argues that the greater weight of the evidence proved that the child's birth defects were caused by a prenatal infection, not any delay in delivering the child.

{¶113} In *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997), the Ohio Supreme Court stated:

Weight of the evidence concerns "the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the greater amount of credible evidence sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its effect in inducing belief."

*Id*. at 387.

{¶114} The use of the term "greater amount" of credible evidence does not mean that an appellate court reviews the facts offered at trial to make its own independent assessment of the evidence of whether that evidence supports the judgment by a preponderance of the evidence. The use of the word "manifest" in the standard of review means that the trier-of-fact's decision must be plainly or obviously contrary to all of the evidence. This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact has the superior opportunity to view the evidence, so it is not the role of a reviewing court to assess the credibility of the evidence. *State ex rel. Consolidation Coal Co. v. Indus. Comm.*, 78 Ohio St.3d 176, 177, 677 N.E.2d 338 (1997). The trier of fact has the authority to "believe or disbelieve any witness or accept part of what a witness says and reject the rest." *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶115} Stewart alleged that her son's birth defects were caused by his brain bleeding in utero just hours prior to delivery and, had MetroHealth and Dr. Weight performed a timely Caesarean section to deliver the child, the effects of the bleeding

would have been minimized. MetroHealth denied that accusation and attributed the child's birth defects to an infection that he contracted in utero from Stewart.

{¶116} Stewart had a prior history of delivering a child early — the birth of an older son occurred by emergency Caesarean at 32-weeks gestation. Her pregnancy in this case took a similar course: between March 20 and March 30, 2003, Stewart had three episodes of preterm labor. After admission to MetroHealth, medication successfully stopped her contractions on the first two occasions, leading to her discharge from the hospital. On the third occasion on which she was admitted with premature labor, Stewart had dilated slightly. This dilation, in conjunction with her prior history of early delivery, caused MetroHealth and the doctor to recommend an elective Caesarean delivery. At the time this recommendation was made, the child had just passed 24 weeks of gestation and was considered viable.

{¶117} Delivery by Caesarean section did not occur immediately because Stewart had vaginal bleeding. She was transferred into MetroHealth's antepartum unit for observation pending cessation of the bleeding. Although the bleeding had not wholly subsided, Weight discharged Stewart.

{¶118} Ten days later, Stewart returned to MetroHealth complaining of contractions. An exam showed her cervix dilated to four millimeters. A fetal monitor showed that her son had a steady heartbeat, so Weight did not immediately perform a Caesarean section and finished his office hours. In the next four hours following Weight's decision not to perform an immediate delivery by Caesarean section, the child's

heartbeat became more and more erratic. Over those four hours, an attending nurse made 15 calls to Weight and to other obstetricians. When Weight returned to Stewart, he suspected that the fetal heartbeat monitor was indicating that the child was becoming asphyxiated. When testing confirmed that suspicion, Weight immediately delivered the child by Caesarean section. The child was not breathing when delivered and required nearly 30 minutes of cardio-pulmonary resuscitation.

{¶119} The fetal heartbeat monitor showed that the child's heartbeat had fluctuated greatly in the hours prior to his delivery. Tests conducted following his delivery showed that the child lost almost 40 percent of his circulating blood volume in the four hours before his delivery, the cause being the highly fluctuating heartbeat. The cause of this fluctuation was a brain bleed, the existence of which was confirmed by the presence of a blood clot detected in an ultrasound examination performed shortly after the child's birth.

{¶120} Upon delivery, the child showed the presence of "putrid secretions" in his airways, indicating the presence of an infection. This infection was not present in amniotic fluid examined during an amnioscentisis performed just two weeks prior to the child's birth, but Stewart tested positive for "group beta strep" following delivery. MetroHealth's experts testified that the infection reached the child's lungs and prevented him from breathing at birth. They theorized that the child's brain bleeding was the product of CPR required as a result of his clogged airways and that an earlier delivery would not have changed that outcome.

{¶121} This was not a case where there was no evidence of any kind to support Stewart's allegation that MetroHealth and Weight were negligent for failing to take immediate steps to deliver the child — both Stewart and MetroHealth offered a number of experts to support their respective theories of how and why the child suffered the brain injury. MetroHealth argues that it offered superior evidence, but that assertion simply underscores the reality that the experts disagreed with their counterparts. The jury heard credible evidence from which it could find that the child's fluctuating heartbeat in the hours before his delivery required Weight to perform an immediate delivery by Caesarean section. For us to agree that MetroHealth's evidence was "superior" would be to usurp the jury's function as the trier of fact and substitute our judgment. The court did not abuse its discretion by denying MetroHeatlth's motion for a new trial on grounds that the verdict was against the manifest weight of the evidence.

## D. Installment Payments

{¶122} MetroHealth's final argument on cross-appeal is that the court erred when it denied MetroHealth's motion for payment of any judgment of nonactual-loss damages in annual installments as allowed by R.C. 2744.06(B)(2).

{¶123} R.C. 2744.06(B)(2) states:

> Except as specifically provided to the contrary in this division, a court that renders a judgment against a political subdivision as described in division (A) of this section and that is not in favor of the state may authorize the political subdivision, upon the motion of the political subdivision, to pay the judgment or a specified portion of the judgment in annual installments over a period not to exceed ten years, subject to the payment of interest at the rate specified in division (A) of section 1343.03 of the Revised Code. A court shall not authorize the payment in installments under this division of

any portion of a judgment or entire judgment that represents the actual loss of the person who is awarded the damages.

Additionally, a court shall not authorize the payment in installments under this division of any portion of a judgment or entire judgment that does not represent the actual loss of the person who is awarded the damages unless the court, after balancing the interests of the political subdivision and of the person in whose favor the judgment was rendered, determines that installment payments would be appropriate under the circumstances and would not be unjust to the person in whose favor the judgment was rendered. If a court makes that determination, it shall fix the amount of the installment payments in a manner that achieves for the person in whose favor the judgment was rendered, the same economic result over the period as that person would have received if the judgment or portion of the judgment subject to the installment payments had been paid in a lump sum payment.

{¶124} Because the statute uses the permissive word "may" in describing the court's authority to grant a motion for installment payments, we use an abuse of discretion standard to review MetroHealth's argument. *Dorrian v. Scioto Conservancy Dist.*, 27 Ohio St.2d 102, 108, 271 N.E.2d 834 (1971).

{¶125} MetroHealth did not offer a specific reason why it should be allowed to pay the judgment in installments apart from noting that, as a county hospital, protection of its finances is "of paramount importance." That is a truism that could apply to everyone. Missing from its argument is any assertion as to why, in this particular case, MetroHealth should be allowed to make installment payments. We recognize that MetroHealth is liable to pay a very large judgment. But that judgment is backed by the full faith and credit of Cuyahoga County. MetroHealth makes no claim that it cannot satisfy the judgment in whole if required to do so.

E. Summary

{¶126} To summarize our holding with respect to the issues raised in the cross-appeal: an unborn, viable child can maintain an independent claim for lack of informed consent; the court did not err by allowing Stewart to forego cross-examination of the witness; the jury's verdict was not against the manifest weight of the evidence; and the court did not abuse its discretion by denying MetroHealth's motion for payment of any judgment of nonactual-loss damages in annual installments.

{¶127} Judgment affirmed in part, reversed in part, and remanded.

It is ordered that the parties share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

MARY EILEEN KILBANE, P.J., and
MARY J. BOYLE, J., CONCUR