[Cite as *State v. Grater*, 2018-Ohio-3000.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NOS.  7-18-01,
                                           7-18-02, 7-18-03, 7-18-04,

      v.                                7-18-05, 7-18-06, 7-18-07,
                                           7-18-08, 7-18-09

CHARLES L. GRATER,

      DEFENDANT-APPELLANT.        O P I N I O N

---

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NOS.  7-18-10,
                                           7-18-11, 7-18-12, 7-18-13,

      v.                                7-18-14, 7-18-15, 7-18-16,
                                           7-18-17, 7-18-18

NORMA J. GRATER,

      DEFENDANT-APPELLANT.        O P I N I O N

---

**Appeals from Napoleon Municipal Court**
**Trial Court Nos.  17CRB0473, 17CRB0474, 17CRB0475, 17CRB0476,**
**17CRB0477, 17CRB0478, 17CRB0479, 17CRB0480, 17CRB0481,**
**17CRB0464, 17CRB0465, 17CRB0466, 17CRB0467, 17CRB0468,**
**17CRB0469, 17CRB0470, 17CRB0471, 17CRB0472**

**Judgments Affirmed**

**Date of Decision:    July 30, 2018**

---

APPEARANCES:

    *Charles L. and Norma J. Grater,* **Appellants**

    *Katie L. Nelson* **for Appellee**

**PRESTON, J.**

**{¶1}** Defendants-appellants, Norma Grater ("Norma") and Charles Grater ("Charles"), appeal the December 13, 2017 judgment entries of the Napoleon Municipal Court finding them guilty of violating the Damascus Township Zoning Resolution (the "Resolution"). For the reasons that follow, we affirm.

**{¶2}** This case stems from an ongoing zoning dispute between Norma and Charles and Damascus Township, Henry County, Ohio. Norma and Charles, who are sister and brother, are joint owners, along with two other relatives, of a parcel of real estate situated on County Road M in McClure, Ohio (the "Property"). In June 2015 and July 2016, Charles received formal notices from Damascus Township informing him that the Property was not in compliance with the Resolution. (State's Exs. 31, 32). Finally, in May 2017, Charles and, for the first time, Norma—who had been added to the notices—received a notice warning them that they had until June 10, 2017 to bring the Property into compliance with the Resolution. (State's Ex. 33). Because Norma and Charles failed to meet this deadline, a total of 36 complaints were filed against Norma and Charles on June 13, 2017. Norma was charged in case numbers 17CRB0464, 17CRB0465, 17CRB0466, 17CRB0467, 17CRB0468, 17CRB0469, 17CRB0470, 17CRB0471, and 17CRB0472 ("Norma's

Cases").[1]   Charles was charged in case numbers 17CRB0473, 17CRB0474, 17CRB0475, 17CRB0476, 17CRB0477, 17CRB0478, 17CRB0479, 17CRB0480, and 17CRB0481 ("Charles's Cases").[2]  Norma and Charles were each charged with nine violations of Article IV, Section Seven of the Resolution—each count representing one month during the period of September 8, 2016 through June 7, 2017 of which the Property was not in compliance with the Resolution.  (Norma's Cases Doc. No. 1); (Charles's Cases Doc. No. 1).  In addition, Norma and Charles were each charged with nine violations of Article IV, Section Eight of the Resolution—each count representing one month during the period of September 8, 2016 through June 7, 2017 of which the Property was not in compliance with the Resolution.  (*Id.*); (*Id.*).  On July 13, 2017, Norma and Charles appeared for arraignment, waived counsel, and entered pleas of not guilty.  (Norma's Cases Doc. No. 3); (Charles's Cases Doc. No. 3).

{¶3} A joint bench trial was held on November 28, 2017.  (*See* Norma's Cases Doc. No. 6); (*See* Charles's Cases Doc. No. 6).  On December 13, 2017, the trial court found Norma guilty on all 18 counts against her and Charles guilty on all 18 counts against him.  (Norma's Cases Doc. No. 7); (Charles's Cases Doc. No. 7).

---

[1] The records in all nine of Norma's Cases are identical, and the documents in each record bear identical numbers.  As such, for ease of reference, citations to the records in Norma's Cases will be formatted in the following manner:  (Norma's Cases Doc. No. xx).

[2] As with the records in Norma's Cases, the records in all nine of Charles's Cases are identical.  As such, citations to the records in Charles's Cases will be formatted in the following manner:  (Charles's Cases Doc. No. xx).

The trial court fined Charles $400 for each of his 18 violations. (Charles's Cases Doc. No. 7). However, the trial court suspended $375 of each fine on the condition that Charles "have no violations of Article IV of the [Resolution] * * * for a two year period." (*Id.*). Similarly, the trial court fined Norma $150 for each of her 18 violations. (Norma's Cases Doc. No. 7). The trial court suspended the entirety of Norma's fines on the condition that Norma "have no violations of Article IV of the [Resolution] * * * for a two year period." (*Id.*).

{¶4} On January 12, 2018, Norma and Charles filed notices of appeal. (Norma's Cases Doc. No. 9); (Charles's Cases Doc. No. 9). Norma's and Charles's appeals were subsequently consolidated for purposes of briefing and argument. They raise three assignments of error.

**Assignment of Error No. I**

**The Manifest Weight of the Evidence Cannot Support Beyond a Doubt [sic].**

{¶5} In Norma and Charles's first assignment of error, they argue that their convictions for violating the Resolution are against the manifest weight of the evidence. Specifically, Norma and Charles argue that the trial court's determination that they are maintaining a junkyard at the Property in violation of the Resolution is against the manifest weight of the evidence because the State's evidence does not show that there is "junk" on the Property. Further, Norma and Charles argue that

the trial court's determination that they are storing scrap metal on the Property is against the manifest weight of the evidence.

{¶6} In determining whether a conviction is against the manifest weight of the evidence, a reviewing court must examine the entire record, "'weigh[ ] the evidence and all reasonable inferences, consider[ ] the credibility of witnesses and determine[ ] whether in resolving conflicts in the evidence, the [trier of fact] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). A reviewing court must, however, allow the trier of fact appropriate discretion on matters relating to the weight of the evidence and the credibility of the witnesses. *State v. DeHass*, 10 Ohio St.2d 230, 231 (1967).

{¶7} Townships may enforce their zoning ordinances either by civil action or by criminal prosecution under R.C. 519.23.[3] *Spencer Twp. Bd. of Trustees v. Dad's Auto Parts, L.L.C.*, 6th Dist. Lucas No. L-09-1188, 2010-Ohio-2253, ¶ 19, citing *State v. McNulty*, 111 Ohio App.3d 828, 830-832 (6th Dist.1996) and *W. Chester Twp. Zoning v. Fromm*, 145 Ohio App.3d 172, 176-177 (12th Dist.2001).

---

[3] R.C. 519.23 provides: "No building shall be located, erected, constructed, reconstructed, enlarged, changed, maintained, or used, and no land shall be used in violation of any resolution, or amendment or supplement to such resolution, adopted by any board of township trustees under sections 519.02 to 519.25, inclusive, of the Revised Code. Each day's continuation of a violation of this section may be deemed a separate offense."

*See State v. Workman*, 3d Dist. Mercer No. 10-13-13, 2014-Ohio-258, ¶ 6 ("R.C. 519.23 * * * is the state statute upon which criminal liability for violation of a township zoning code is predicated."). "Criminal proceedings for violation[s] of [township] zoning ordinances * * * require proof beyond a reasonable doubt." *Spencer Twp.* at ¶ 19.

{¶8} Norma and Charles were each charged with nine violations of Article IV, Section Seven of the Resolution and nine violations of Article IV, Section Eight of the Resolution. Article IV, Sections Seven and Eight of the Resolution provide:

> {¶9} The following structures and uses are hereby prohibited[:]
>
> * * *
>
> 7.    Dumping, storing, burying, reducing, disposing of or burning garbage, refuse, scrap metal, rubbish, offal, or dead animals except such as result from the normal use of residential or agricultural premises, unless such dumping is done at a place provided by the Township Trustees for such specific purposes.
>
> 8.    *Junk yards*, automobile graveyards, or places for the collection of scrap metal, paper, rags, glass, or junk for salvage purposes or for dismantling used vehicles or machinery.

(Emphasis added.). The Resolution does not define the term "junk yard." "Junk yard," as defined in the Ohio Revised Code, "means an establishment or place of

business that is maintained or operated for the purpose of storing, keeping, buying, or selling junk." R.C. 4737.05(B). *See also* 1991 Ohio Atty.Gen.Ops. No. 91-018, syllabus (concluding that property that is "maintained or operated as a commercial establishment or place of business for the purpose of storing, keeping, buying, or selling" "old or scrap materials" is a junk yard). By the same token, "'[j]unk' means old or scrap copper, brass, rope, rags, trash, waste, batteries, paper, rubber, iron, steel, and other old or scrap ferrous or nonferrous materials, but does not include scrap tires as defined in [R.C. 3734.01]." R.C. 4737.05(A).

{¶10} At trial, the State offered the testimony of Justin Niese ("Niese"), the Deputy Engineer and Surveyor with the Henry County Engineer's Office, who identified State's Exhibits 1 through 4 as aerial photographs printed from the Henry County Geographic Information System ("GIS"). (Nov. 28, 2017 Tr. at 11, 13-15). State's Exhibits 1 through 4 depict the Property at three points in time—2006, 2012, and 2016—and track the gradual expansion of a collection of various items on the Property from a modestly sized assortment of vehicles, machinery, and other miscellanea in 2006 to a sprawling assemblage which, by 2016, covered most of the Property and spilled out onto at least two adjacent or contiguous parcels of real estate. (*See* State's Exs. 1, 2, 3, 4). Niese testified that the GIS reflects that Norma owned the Property. (Nov. 28, 2017 Tr. at 14). Niese testified that the GIS lists the approximate size of the Property as 2.06 acres. (*Id.*).

-7-

**{¶11}** Next, Greg Smith ("Smith"), a Damascus Township Trustee, testified that one of his principal duties as township trustee is to assist with enforcement of the Resolution. (*Id.* at 18). Smith testified that he is familiar with the Property. (*Id.* at 22). When asked whether he knew who owns the Property, Smith responded: "Mr. Grater, Charles Grater and his sister, maybe another sister, I'm not sure on the whole title." (*Id.*). Smith testified that Charles lives at the Property. (*Id.*).

**{¶12}** Smith identified State's Exhibit 5 as an accurate copy of the Resolution. (*Id.* at 19-20). (State's Ex. 5). He testified that, to the best of his knowledge, the Resolution has not been amended since its original effective date in 1968. (Nov. 28, 2017 Tr. at 21). Smith also identified State's Exhibits 6 through 24 as various photographs of the Property. (*Id.* at 23-25). Like State's Exhibits 1 through 4, State's Exhibit 6 is an aerial photograph of the Property; however, there is no indication as to when the photograph was taken. (*See* State's Ex. 6). Smith testified that he personally took the photographs designated as State's Exhibits 7 through 24 from the road in front of the Property and that the photographs accurately depict the Property as it appeared from September 8, 2016 through June 7, 2017. (Nov. 28, 2017 Tr. at 24-25). (*See* State's Exs. 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24). Although Smith testified that all the photographs labeled as State's Exhibits 7 through 24 were taken during the time period of

September 8, 2016 through June 7, 2017, he could not remember the exact dates that he took the photographs. (Nov. 28, 2017 Tr. at 36).

{¶13} Smith stated that the Property had "gotten worse" since he took the photographs designated as State's Exhibits 7 through 24. (*Id.* at 37). According to Smith, "[s]ome stuff has been moved and removed but more stuff has been added to the collection." (*Id.*). Smith testified that, in his "way of thinking," the Property was not in compliance with the Resolution. (*Id.*). Smith testified that he tried to speak with the Graters "[o]n numerous occasions" to ask them to bring the Property into compliance with the Resolution but that his efforts failed. (*Id.* at 38). Smith described some of the Graters' efforts to clean the Property, as well as a particular exchange with Charles, as follows:

> [F]rom the first time we were out there you couldn't even walk in the driveway hardly * * * and [Charles] made some attempt to sort some of that so he could make a path back through there. On one occasion we were there and I was, at the time, working for a fabrication business south of Napoleon and there was [sic] a few air compressors sitting there * * * and I said, what about the air compressor? I said, why is it sitting there? He said, well nobody wants it * * * and I said, what do you want for it? [He told me] * * * today I'll take $100 for it. So I took my phone out to take a picture of it because we were in

need of one where I worked and he said, well let me get the junk off of it first before I could take the picture. I took the picture, showed it to my boss and he wrote him a check and I went out and picked it up two days later.

(*Id.* at 38-39).

{¶14} Smith testified that, as far as he knew, the Graters do not have a license to run a junkyard, salvage yard, or automobile graveyard at the Property, and they do not have a permit or a variance from Damascus Township to operate a junkyard. (*Id.* at 39). Finally, Smith identified State's Exhibits 25 through 30 as a series of "Craigslist listings for vehicles that evidently, * * * [Charles] has for sale online." (*Id.* at 39-40). (*See* State's Exs. 25-30). Smith testified that he saw "some" of the Craigslist advertisements but that he "didn't see all of them * * *." (Nov. 28, 2017 Tr. at 40). Smith testified that each advertisement depicts the place of sale as "about the location of [Charles's] residence." (*Id.*).

{¶15} Charles, pro se, then proceeded to cross-examine Smith. On cross-examination, Smith testified that the air compressor that his boss purchased from Charles is "in use today" although it had to be repaired by "taking things off of it that were damaged from mishandling * * *." (*Id.* at 46). Charles asked Smith about the quality of the air compressor at the time of purchase:

[Charles]: So [the air compressor is] one thing you wouldn't consider to be junk, is that correct?

[Smith]: For the price we paid for it, I would call it salvage price. That's probably a several hundred-dollar air compressor.

(*Id.* at 47). Charles then asked Smith about the items that were on top of the air compressor that Charles allegedly called "junk":

[Charles]: You mentioned that I referred to some things that were lying on top of [the air compressor] as junk. Do you remember what those were?

[Smith]: Yes, they were boxes of concrete anchor bolts.

[Charles]: [They were] [b]rand new [anchor bolts], right?

* * *

[Smith]: I don't know, they were rusty, in boxes that were starting to fall apart.

[Charles]: Are you sure they were rusty?

[Smith]: Yes they were. You're the one that referred to them as junk sir.

* * *

> [Smith]: I went to take the picture and you said, let me get the junk off of it first, because it was covered with it. You're the one that said it.

(*Id.* at 47-48).

{¶16} Charles then asked Smith about some of the items depicted in State's Exhibits 1 through 24. (*See id.* at 49). First, Charles directed Smith's attention to "[s]ome bumpers and a grill off a truck" depicted in one of the State's exhibits:

> [Charles]: What do you think about [the bumpers and grills]? Did I take those off a vehicle or did I possibly buy them as they were at an auction?
>
> [Smith]: I have no idea.
>
> [Charles]: Would I have any use for those parts, do you think?
>
> [Smith]: I have no idea what you have a use for.
>
> [Charles]: Is there any limit in the township resolution on the amount of stuff that I can own?
>
> [Smith]: I would say there is not a limit to the amount of things you can own, but going back to what the zoning rules stipulation [sic], and the papers that I just read of your list of Craigslist, I would say you're using it for a salvage yard, under my personal opinion.

> [Charles]: Do you see anything in any of those pictures that you know is junk?
>
> [Smith]: My opinion? I would call a lot of it junk, 90% of its [sic] junk.

(*Id.* at 49-50). When asked whether he "really kn[ew]" whether anything on the Property was "junk" or whether he "kn[ew] anything about the condition of" the items on the Property, Smith responded that because "[he had] never been on the property," he could not "know the condition of" any of the items. (*Id.* at 50).

{¶17} Next, Charles asked Smith whether Smith saw "anything in [State's Exhibits 1 through 24] that couldn't be used on a farm?" (*Id.*). Smith answered: "I would question what [use you have for] school buses, ambulances, [and] fire trucks." (*Id.*). In response, Charles asked the following questions: "Could I put bags of seed in an ambulance to keep the mice from getting to it?"; "Could I use [the ambulance] to haul seed home from where I bought it?"; "I could haul water with [the firetruck], couldn't I, for spring? Or livestock?"; "I could put chickens in [the school bus] couldn't I?"; and "I could store things [in the school bus] too, like seed? Other supplies that I don't want to get wet?" (*Id.* at 50-52). Smith conceded that those vehicles could conceivably be used for the agricultural purposes identified by Charles. (*Id.*). Charles also questioned Smith about the quality of a ditching machine on the Property. Smith testified that he "seriously doubt[ed]" that the

ditching machine was operable in its then-present state. (*Id.* at 52). Smith stated that "[l]ooking at the amount of rust on [the ditching machine], [he] would say if [Charles] were to drag it or drive it ahead [Charles] would have to sweep up what was left on the ground." (*Id.* at 52-53). When asked about how close he had been to the ditching machine, Smith stated that he had been "[c]lose enough to see that it is a rusty pile of scrap. Or that is the appearance you get from the road." (*Id.* at 53). However, Smith testified that he did not know whether the ditching machine's motor "turns over or runs." (*Id.*).

{¶18} In addition, Smith testified that the Resolution does not define the word "junk" but that the "definition would be pretty much common knowledge." (*Id.* at 53-54). Charles then asked Smith whether Smith saw "anything in [State's Exhibits 1 through 24] that has missing parts." (*Id.* at 55). Smith responded that in "[s]ome pictures[,] all it is is parts." (*Id.*). Smith testified that he had "no way of knowing how [the parts] were acquired or how they got there." (*Id.*). Smith testified that some of the "articles" on the Property have not been moved since 2006 and that Smith "would say [that Charles does not] use them." (*Id.* at 55-56). However, when asked whether he could point out one of the articles that has not been moved since 2006, Smith failed to do so. (*See id.* at 56). Smith conceded that he has "no idea what [Charles] use[s] in [his] daily realm of operation." (*Id.*).

{¶19} When asked by Charles to give an example of a "junk vehicle" on the Property, Smith stated that "[s]ome of them don't look like * * * they're all there. The combine with an axle missing." (*Id.* at 57). Charles asked Smith whether he was sure that the combine was missing an axle and Smith responded: "Either that or it's sunk in the dirt." (*Id.*). However, Smith acknowledged that it was possible that the combine was simply missing its rear wheels. (*Id.* at 57-58). After Charles asked Smith whether Smith would "believe * * * that none of the vehicles on [the Property] fit" the definition of "junk vehicle," Smith responded that he "would find it hard to believe none of them" but that he would "take [Charles's] word for it." (*Id.* at 58). Finally, Charles asked whether Smith could see any of the vehicles Smith classified as "junk vehicles" from the road. (*Id.*). Smith responded that from "looking at the aerial picture, what you can see from the road is probably less than 10% of the acquired mass." (*Id.*). Smith conceded that from the aerial photographs, he could not definitively conclude which vehicles were "junk vehicles" because the vehicles are "too far away to tell. You can just see that there is a large quantity." (*Id.* at 58-59).

{¶20} On re-direct examination, Smith confirmed that Charles referred to the items on top of the air compressor as "junk." (*Id.* at 59). Smith testified that he was amused by Charles's statement because Charles had earlier insisted that nothing on the Property was "junk." (*Id.* at 60). Smith testified that State's Exhibit 7 depicted,

in part, "a grill out of a, looks like an International Truck." (*Id.*). He testified that the grill was a part of a truck. (*Id.*). After he was asked whether Charles was operating a junkyard, salvage yard, or automobile graveyard, Smith remarked that "[he] would assume so from his ads he runs in Craigslist." (*Id.* at 61). When asked to describe the contents of the Craigslist advertisement marked as State's Exhibit 27, Smith stated: "Well he lists several options of how you can buy [the school bus listed in the advertisement], parts, pieces, or the whole thing, different options available, just different combos available, just ask." (*Id.* at 62). After being asked whether "with [Smith's] common knowledge of what a salvage yard is, is that what [Charles was] doing," Smith replied that "[t]hat would be [his] definition [of a salvage yard]." (*Id.*).

{¶21} Smith testified that he has only been on the Property to the extent of the driveway. (*Id.* at 62-63). He testified that Charles did not give him permission to go onto the Property other than the driveway and that he did not ask Charles for permission to venture further onto the Property. (*Id.* at 63). Smith testified that from his pictures and from what he saw from the road, there are parts of vehicles on the property as well as an ambulance, "semis," and a firetruck. (*Id.* at 63-64).

{¶22} On re-cross-examination, Charles noted and Smith agreed that in State's Exhibit 27 "[the Craigslist advertisement] mentioned that the engine could be bought separately and it also mentions a Dodge pickup that doesn't have an

engine." (*Id.* at 64). Charles asked whether Smith thought it was "possible that [Charles] may have bought that bus for the engine to put in the pickup truck and plan another use for the body of the bus as storage or to put chickens in." (*Id.*). Smith responded that he did not have any "idea what [Charles's] plans were." (*Id.*). Charles then asked whether he could have purchased the school bus "for a plan, for part of my farming operation, right?" (*Id.* at 65). Smith replied that he had "no idea what [Charles's] plan was. [Was] it possible? Anything is possible." (*Id.*). Finally, in regards to the grill for the International Truck depicted in State's Exhibit 7, Charles asked whether Smith saw any other International Trucks in the State's Exhibits that the grill could fit on. (*Id.*). Smith testified that although he saw other International Trucks, he did not know "what fits on what." (*Id.*).

{¶23} Finally, Mike Plotts ("Plotts"), the Damascus Township Zoning Inspector, testified that he is tasked with enforcing the Resolution and that he is familiar with the Property. (*Id.* at 67-69). Plotts testified that he believed that "Charles and Norma Grater and family" own the Property and that Charles lives there. (*Id.* at 69). Plotts stated he received complaints about the Grater property, including from "[a] neighbor, and then [from] some other people with parked vehicles or machinery parked right against the road to where it was a safety issue[] basically * * *." (*Id.* at 70). He testified that the complaints alleged that the Property

"is cluttered. * * * [It's] a junk yard, basically." (*Id.*). Plotts stated that the Property is not in compliance with the Resolution because

> things are coming there and being taken apart, which would be considered salvage. Or they're being sold which, I'm not sure how the state law reads as far as retitling things and going on that route, but it's not, we have no record of it being titled that way as far as to sell vehicles out of.

(*Id.* at 70-71).

{¶24} Plotts testified that when he was on the Property, he saw items he considered to be "junk." (*Id.* at 72). He also testified that he saw items that were being "parted out" for salvage purposes. (*Id.*). Plotts testified that, after he spoke with Charles about bringing the Property into compliance with the Resolution, Charles made some changes. (*See id.*). Plotts stated that "at one point[,] there was more of a driveway opened up closer to the house again, but then it fill[ed] back in." (*Id*). After being shown State's Exhibits 1 and 2, which are aerial photographs of the Property from 2016, Plotts testified that State's Exhibits 1 and 2 accurately depict the Property as it appeared from September 8, 2016 through June 7, 2017. (*Id.* at 74-75). Plotts testified that, to the best of his knowledge, Norma and Charles do not have vendor's licenses to operate a junkyard, salvage yard, or automobile

-18-

graveyard and that neither Norma nor Charles have a permit or variance from Damascus Township to operate a junkyard. (*Id.* at 75).

{¶25} Plotts identified State's Exhibits 31 through 33 as letters sent to Norma and Charles from Damascus Township informing them that the Property was not in compliance with the Resolution. (*Id.* at 75-76). (*See* State's Exs. 31, 32, 33).[4] Plotts testified that all of the letters were sent via registered mail and that he "receive[d] the green card back" demonstrating that Norma and Charles received the letters. (Nov. 28, 2017 Tr. at 77).

{¶26} Finally, Plotts admitted that although he received permission to enter the Property, he did not "go out" to the Property. (*Id.*). When asked whether "[Charles] or [Norma] ever call[ed] [him] and [said] [']come on out [we will] show you around [our] property,[']" Plotts responded: "No." (*Id.*). Plotts testified that he has never "been on" the Property. (*Id.* at 78).

{¶27} On cross-examination, Charles asked Plotts whether Plotts "remember[ed] anything in particular" about the scrap metal and vehicles Plotts saw on the Property that would "identify them." (*Id.* at 78-79). Plotts testified that he saw "parts and pieces" and "pallet type things with stuff laying in them." (*Id.* at 79). Plotts admitted that he did not know where the parts came from. (*Id.*).

---

[4] State's Exhibits 31 and 32, notices from June 2015 and July 2016, respectively, are addressed solely to Charles. (*See* State's Exs. 31, 32). State's Exhibit 33, a notice from May 2017, is addressed to Charles and Norma. (*See* State's Ex. 33).

Although Plotts testified that he saw hoods and engines strewn about the Property, he conceded that he could not say that he actually saw vehicles with missing parts on the Property. (*Id.*). Charles also inquired about the items that Plotts considered to be scrap metal:

> [Charles]: And what did you see that you would consider to be scrap?
>
> [Plotts]: Once again, stuff that's laying in, either in a pile or in those tote type things or pallets, things like that. I can't go on the property; the last time we met up here in the prosecutor's office you had two engines in the back of your pickup truck.

(*Id.*). Plotts testified that Charles could have "possibly" had the two engines to put them in a vehicle to repair it. (*Id.* at 80). Charles asked Plotts whether Plotts could "think of a reason why [Charles] would have scrap metal on a pallet; wouldn't [Charles] just have it on a pile if [he] was going to scrap it?" (*Id.*). Plotts replied: "I would think." (*Id.*). Further, Plotts could not identify scrap metal in State's Exhibits 1 through 24. (*See id.*).

{¶28} Charles then questioned Plotts about the items Plotts observed in the driveway of the Property:

> [Charles]: I remember a comment that [it] looked like you couldn't drive in the driveway. Do you know whether or not the vehicles that

were in the driveway run? Is it possible that they run [and] they just were parked there at the time?

[Plotts]: It wasn't just vehicles.

[Charles]: What else was in the driveway?

[Plotts]: Parts and these totes and things were sitting out.

* * *

[Plotts]: Some of these totes and things that were sitting around. Like trailers and things like that were all parked there.

* * *

[Plotts]: Things with the metal on them.

[Charles]: Things with metal on them. A trailer with metal on it or what?

[Plotts]: Like pallets and that.

[Charles]: Pallets in the driveway or along the driveway?

[Plotts]: At times they've been in the driveway, I don't know if you just unloaded them or what, but I've seen them there.

(*Id.* at 80-82).

{¶29} Finally, Plotts testified that he is "sure there are things that may not be of use" on the Property. (*Id.* at 83). Plotts testified that he had "no idea" whether

-21-

there were items on the Property that "maybe needed a little work that wouldn't take a whole lot to get * * * fixed." (*Id.*).

{¶30} Thereafter, the State moved to admit its exhibits and rested. (*Id.* at 84). State's Exhibits 1 through 33 were admitted without objection. (*Id.* at 84-85). (*See also id.* at 15, 20, 26, 41, 76).

{¶31} Charles then offered the following statement:

[The State] still hasn't proven that any of this stuff is junk. And the exhibit that I submitted, the list of all the items in my yard, have values on it, another thing I can add to that is I counted all the items on there and applied what I thought would be an average weight that would fit and multiplied those by the scrap price right now and it came out to $65,000 and some odd dollars, but the value of this, which is a conservative estimate for the bank was $273,000. There is quite a difference there between what this stuff would be worth if it were junk and what it really is worth. One of the witnesses said he saw junk vehicles there, [but] he didn't say when he saw it * * *. As far as his statement about the [driveway] being blocked, I know those pictures are from the time frame but I think they show it being open.

(*Id.* at 91-92).

**{¶32}** On cross-examination, Charles did not contest that he was part owner of the Property during the time frame of September 8, 2016 through June 7, 2017, and he conceded that the Property is located in Damascus Township. (*Id.* at 92). He testified that he owns the Property along with his sisters, including Norma. (*Id.* at 93).

**{¶33}** Charles testified that he sold vehicles and equipment from the Property. (*Id.*). He admitted that he does not have a vendor's license and that he has not been granted a variance or permit by Damascus Township. (*Id.* at 93-94). Charles confirmed that he offered to sell parts of the school bus as stated in State's Exhibit 27. (*Id.* at 94). Further, while he stated that he was offering a Dodge Ram for sale which was missing its engine, Charles denied that he was offering the Dodge Ram for parts. (*Id.* at 95). He further testified that he offered a Chevrolet Blazer for sale, that he had parts for the Blazer, that those parts were located on the Property, and that those parts were separate from the vehicle itself. (*Id.*). When asked whether he was selling parts for the Blazer, Charles responded that he was "selling [parts] *with* [the Blazer]." (Emphasis added.) (*Id.* at 95-96). The State asked Charles whether he was "selling a bus and * * * selling parts of a bus," to which he replied: "In that particular case, yes, I hadn't yet, but I'm advertising it that way, yes." (*Id.* at 96). Charles stressed that he "do[es] not sell parts as a rule;

no [he] do[es] not disassemble for parts and sell parts." (*Id.* at 105). However, he admitted that he sold parts in the past. (*Id.*).

**{¶34}** Charles also admitted to possessing a host of other items on the Property. (*Id.* at 96-97). He testified that he has stacks of pallets on the Property as well as a firetruck, an ambulance, semi-trucks, and trailers for the semi-trucks. (*Id.*). Charles testified that he goes to auctions, where he buys vehicles and parts of vehicles which he brings back to the Property. (*Id.* at 98).

**{¶35}** The State then questioned Charles concerning the values he assigned to the items on the Property as listed in Defendants' Exhibit A. Charles testified that he assessed the value of the property based on the fact that he has been "going to auctions all [his] life" and that he has "been on Ebay and Craigslist a lot." (*Id.*). He testified that the list was accurate as of January 2017. (*Id.* at 100).

**{¶36}** Charles testified that he frequently moves the items on the Property and that there were two vehicles parked in front of the Property at the time of his testimony which were marked for sale. (*Id.* at 100-101). He admitted that during the entire time frame of the citations, there were items placed near the road at the front of the Property. (*Id.* at 101). He also conceded that there were some tires sitting in front of the Property. (*Id.* at 103). Finally, Charles testified that he removed "some of" the items on the Property in response to the notices from

Damascus Township. (*Id.* at 103-104). However, he conceded that he has "probably" not removed "most of" the items on the Property. (*Id.* at 104).

**{¶37}** Charles then made a final statement in which he again claimed that the State had not demonstrated that there was "junk" on the Property or that the vehicle parts on the Property came from vehicles he disassembled on site. (*See id.* at 107-108). Charles also argued that the State had not shown that the Property was being used to store scrap metal: "Scrap metal, [the State has not] proved that I have scrap metal * * * other than possibly a small amount that any farm would have. Possibly a little bit more for a person who goes to auctions and lots are lumped together." (*Id.* at 107).

**{¶38}** On re-cross-examination, Charles testified that he does not have cars with missing parts on the Property. (*Id.* at 108). He testified that he did have the hood of a truck on the Property and that he had "other trucks it would fit on." (*Id.* at 108-109). He conceded that the hood is a part of a truck. (*Id.* at 109). He testified that a combine on the Property is missing its wheels and that it could not be used in its present form without putting the wheels on. (*Id.*). However, Charles said he could easily put the wheels back on to return it to operating condition. (*Id.* at 109-110).

**{¶39}** Thereafter, Norma and Charles rested. (*Id.* at 110). Charles identified Defendants' Exhibit A as a list of "the items sitting on [his] property that [he]

compiled for the bank with [his] financial statement." (*Id.* at 86). Charles identified Defendants' Exhibits B and C as copies of R.C. 505.173 and 4501.01, respectively. (*Id.* at 87). Charles identified Defendants' Exhibits D through I as a series of "before and after" photographs depicting the Property in 2015 after Charles received a compliance notice from Damascus Township and at some unspecified later date following Charles's attempt to bring the Property into compliance with the Resolution. (*Id.* at 87-89). Defendants' Exhibits A through D, F, and H were admitted without objection. (*Id.* at 89-90). Defendants' Exhibits E, G, and I were admitted over the State's objection. (*Id.*). The State did not present any additional witnesses on rebuttal. (*Id.* at 110). The trial court found Norma and Charles guilty on 18 counts each. (Norma's Cases Doc. No. 7); (Charles's Cases Doc. No. 7).

{¶40} Norma's and Charles's convictions for violating Article IV, Section Seven of the Resolution are not against the manifest weight of the evidence because the State presented considerable competent and credible evidence from which the trial court could have reasonably concluded that Norma and Charles were using the Property to store or dispose of garbage, refuse, scrap metal, or rubbish. Particularly, the weight of the evidence demonstrates that Norma and Charles used the Property to store scrap metal. First, Plotts testified that he remembered seeing scrap metal stacked on the Property. (*See* Nov. 28, 2017 Tr. at 79, 81-82). In addition, Smith testified that he saw machinery on the Property which he described as "scrap" and

that the deteriorated condition of the machinery was apparent even from the side of the road. (*See id.* at 53). Furthermore, many of the State's exhibits depict old or discarded metal objects on the Property, including rusting tire rims and barrels as well as piles of metal. (*See, e.g.*, State's Exs. 7, 10, 11, 12, 15, 16, 18, 19, 20, 24). Although Plotts could not identify specific examples of scrap metal in the State's exhibits and although the photographs were taken from a distance and are, in some instances, blurry, the trial court could have reasonably concluded that the State's exhibits depict scrap metal being stored on the Property during the time period relevant to the alleged violations. *See State v. Moore*, 2d Dist. Greene No. 2010 CA 13, 2011-Ohio-636, ¶ 41 ("The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence."), citing *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 14. Finally, Charles admitted that the amount of scrap metal he stored on the Property was "[p]ossibly a little bit more" than is normal for a residence or agricultural operation because he "goes to auctions and lots are lumped together." (Nov. 28, 2017 Tr. at 107).

{¶41} Likewise, Norma's and Charles's convictions for violating Article IV, Section Eight of the Resolution are not against the manifest weight of the evidence. The trial court's conclusion that Norma and Charles violated Article IV, Section Eight of the Resolution is based on its finding that the Property was being used to

operate an unlicensed junkyard. (*See* Norma's Cases Doc. No. 7); (*See* Charles's Cases Doc. No. 7). There is competent and credible evidence in the record that "junk" was sold from the Property such that the Property was being used as a "junk yard" as the term is used in the Resolution. The State's exhibits, along with Smith's and Plott's testimony, show that the Property was being used as "a repository for a hodgepodge of various materials, many of which clearly meet the statutory definition of, and qualify as nothing more than, scrap or junk." *State v. Spaulding*, 12th Dist. Brown No. CA2002-03-007, 2002-Ohio-6677, ¶ 10. In addition to depicting a multitude of old, rusty vehicles in various stages of operability, the State's exhibits show that the Property contains, among other things, individual parts to automobiles stored in the open, stacks of pallets and other old wood, and piles of metal and other materials stacked on trailers. Moreover, there is little doubt that "junk" was routinely sold, or offered for sale, from the Property. Charles admitted to selling vehicles and parts of vehicles. Further, the Craigslist advertisements demonstrate Charles's willingness to "part out" vehicles for sale if a customer so desired. Finally, Smith's testimony that Charles sold him an air compressor at "salvage price" and that numerous repairs were required to return the air compressor to working condition is further evidence weighing in favor of the conclusion that "junk" was sold or offered for sale from the Property. Finally, that sales of "junk" from the Property were somewhat sporadic does not weigh against

the conclusion that a "junk yard" was maintained at the Property. *See Spaulding* at ¶ 2-3, 10-11 (concluding that Spaulding's conviction for operating an unlicensed junkyard was not against the manifest weight of the evidence where Spaulding admitted to "selling material from his property 'once or twice a year'").

{¶42} Therefore, having weighed the evidence and all reasonable inferences, and considering the credibility of the witnesses, we conclude that the trial court did not clearly lose its way and create such a manifest miscarriage of justice that Norma's and Charles's convictions must be reversed. As such, Norma's and Charles's convictions are not against the manifest weight of the evidence.

{¶43} Norma and Charles's first assignment of error is overruled.

**Assignment of Error No. II**

**Methods of Pushing Their Agenda May Conflict With the Constitution.**

{¶44} In their second assignment of error, Norma and Charles advance three distinct arguments. First, Norma and Charles appear to argue that the Resolution is void for vagueness and thus unconstitutional because it does not define the terms "junk" or "junkyard." Second, Norma and Charles seemingly argue that the Resolution violates their equal-protection rights because it discriminates against "[h]illbillies, rednecks, gearheads, country boys, [and] anyone else who doesn't value neatness * * *." (Appellants' Brief at 11). Finally, Norma and Charles argue that the fines imposed against them for their various violations of the Resolution

-29-

exceed the maximum permissible fines under R.C. 519.99. We will first address Norma and Charles's arguments concerning the constitutionality of the Resolution, then we will examine whether the fines levied against Norma and Charles exceed the maximum amount permitted by law.

{¶45} "The vagueness doctrine, which is premised on the Due Process Clause of the Fourteenth Amendment, requires a statute to give 'fair notice of offending conduct.'" *State v. Lewis*, 131 Ohio App.3d 229, 235 (3d Dist.1999). In considering a challenge to a zoning ordinance as void for vagueness, a court is required to determine whether the ordinance "'(1) provides sufficient notice of its proscriptions to facilitate compliance by persons of ordinary intelligence and (2) is specific enough to prevent official arbitrariness or discrimination in its enforcement.'" *Ambrose v. Galena*, 5th Dist. Delaware No. 15 CAH 01 0011, 2015-Ohio-3157, ¶ 18, quoting *Norwood v. Horney*, 110 Ohio St.3d 353, 2006-Ohio-3799, ¶ 84. "A statute is not unconstitutionally vague merely because it fails to define specific terms." *State v. Sommerfield*, 3d Dist. Union No. 14-07-09, 2007-Ohio-6427, ¶ 13, citing *Rose v. Locke*, 423 U.S. 48, 50 (1975). "Rather, the 'critical question in all cases is whether the law affords a reasonable individual of ordinary intelligence fair notice and sufficient definition and guidance to enable him to conform his conduct to the law.'" *Ambrose* at ¶ 19, quoting *Norwood* at ¶ 86.

{**¶46**} On the other hand, "'[t]he Fourteenth Amendment to the United States Constitution provides that "[no] State shall * * * deny to any person within its jurisdiction the equal protection of the laws." * * * When the government treats similarly situated individuals differently, such action implicates equal protection.'" *Land Dev. Mgt., L.L.C. v. Lancaster*, 5th Dist. Fairfield No. 11-CA-47, 2012-Ohio-3136, ¶ 49-50, quoting *Kruppa v. Warren*, 11th Dist. Trumbull No. 2009-T-0017, 2009-Ohio-4927, ¶ 34-35, quoting the Fourteenth Amendment to the United States Constitution and citing *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). "This is not to say that states cannot, in the exercise of legislative authority, classify persons for the purposes of legislation." *Jones v. MetroHealth Med. Ctr.*, 8th Dist. Cuyahoga No. 102916, 2017-Ohio-7329, ¶ 71. "A statutory classification made in the proper exercise of police power will be upheld if the classification 'bears a rational relationship to a legitimate governmental interest.'" *Id.*, quoting *Menefee v. Queen City Metro*, 49 Ohio St.3d 27, 29 (1990). "'Zoning is a valid legislative function of a municipality's police powers.'" *Steiner v. Morrison*, 7th Dist. Mahoning No. 14 MA 0114, 2016-Ohio-4798, ¶ 13, quoting *Arendas v. Coitsville Twp. Bd. of Trustees*, 7th Dist. Mahoning No. 07-MA-129, 2008-Ohio-6599, ¶ 9, citing *Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926) and Ohio Constitution, Article I, Section 19.

**{¶47}** Here, neither Norma nor Charles asserted their void-for-vagueness or equal-protection arguments in the trial court. "'The Supreme Court of Ohio has held that, "'[f]ailure to raise at the trial court level the issue of the constitutionality of a statute or its application, which issue is apparent at the time of trial, constitutes a waiver of such issue and a deviation from this state's orderly procedure, and therefore need not be heard for the first time on appeal.'"" *State v. Workman*, 3d Dist. Auglaize No. 2-15-05, 2015-Ohio-5049, ¶ 23, quoting *State v. Heft*, 3d Dist. Logan No. 8-09-08, 2009-Ohio-5908, ¶ 29, quoting *State v. Rice*, 3d Dist. Allen Nos. 1-02-15, 1-02-29, and 1-02-30, 2002-Ohio-3951, ¶ 7, quoting *State v. Awan*, 22 Ohio St.3d 120 (1986), syllabus. "'However, the waiver doctrine set forth by *Awan* is discretionary; thus, "even where waiver is clear, a reviewing court may consider constitutional challenges to the application of statutes in specific cases of plain error or where the rights and interests involved may warrant it."'" *Id.*, quoting *Heft* at ¶ 29, quoting *Rice* at ¶ 7, citing *In re M.D.*, 38 Ohio St.3d 149 (1988), syllabus. Nevertheless, "'"'discretion will not ordinarily be exercised to review such claims, where the right sought to be vindicated was in existence prior to or at the time of trial.'"'" *Heft* at ¶ 29, quoting *Rice* at ¶ 7, quoting *State v. 1981 Dodge Ram Van*, 36 Ohio St.3d 168, 170-71 (1988), quoting *State v. Woodards*, 6 Ohio St.2d 14, 21 (1966).

-32-

{¶48} Norma and Charles's void-for-vagueness and equal-protection arguments were available to them at the trial-court level. As such, Norma and Charles waived these two constitutional issues on appeal, and we decline to address them. *See Workman*, 2015-Ohio-5049, at ¶ 24.

{¶49} We turn now to Norma and Charles's argument that the fines imposed by the trial court exceed the maximum amount permitted by law. As discussed above, Norma was fined $150 for each of her violations of the Resolution, and Charles was fined $400 for each of his violations of the Resolution. Each of Norma's violations corresponds to one of Charles's violations and vice versa. In other words, each of Charles's and Norma's charges are based on the same set of facts and occurrences. Thus, for example, for violating Article IV, Section Seven in October 2016, a total of $550 in fines were levied against Norma and Charles; the same is true for the remainder of Norma's and Charles's convictions. Norma and Charles argue that this amount—$550—exceeds the maximum fine permitted under the law.

{¶50} Norma and Charles's argument is meritless. R.C. 519.23, under which Norma and Charles were charged and convicted, provides that "[e]ach day's continuation of a violation of this section may be deemed a separate offense." In turn, R.C. 519.99 provides that "*[w]hoever* violates [R.C. 519.23] shall be fined not more than five hundred dollars for each offense." (Emphasis added.). Here, each

of Norma's and Charles's convictions constitute separate offenses and each of their individual fines fall squarely within the range permitted by R.C. 519.99. Because Norma and Charles both hold title to the Property, each is separately and individually responsible for ensuring that the Property is in compliance with the Resolution. *See State v. Crawford*, 3d Dist. Allen Nos. 1-01-150, 1-01-151, and 1-01-152, 2002-Ohio-2709, ¶ 1, 4-5 (noting that a husband and wife, who jointly owned property that was in violation of local zoning ordinance, were each assessed a $100 fine for the violation). Thus, it is of no consequence that the aggregate amount of Norma's and Charles's fines for a particular violation of the Resolution in a given month exceeds $500.

{¶51} Norma and Charles's second assignment of error is overruled.

### Assignment of Error No. III

### Only 2 of 4 Property Owners were Charged and Summoned.

{¶52} In their third assignment of error, Norma and Charles argue that the trial court erred by finding them guilty of violating the Resolution because the State failed to prosecute every owner of the Property. Specifically, Norma and Charles contend that, because the other two members of their family with whom they own the Property were not prosecuted, they were unfairly targeted for prosecution.

{¶53} Although Norma and Charles do not use the term, they advance what is essentially a theory of selective prosecution. To establish a claim of selective

prosecution, a defendant bears the burden of demonstrating "(1) that, while others similarly situated have not generally been proceeded against for conduct of the type forming the basis of the charge against [the defendant], [the defendant has] been singled out for prosecution, and (2) that the government's discriminatory selection of [the defendant] for prosecution has been invidious or in bad faith." *Crawford*, 2002-Ohio-2709, at ¶ 31, citing *State v. Freeman*, 20 Ohio St.3d 55, 58 (1985). "This burden is a heavy one, and a mere showing that another person similarly situated was not prosecuted is not enough; the defendant[] must demonstrate actual discrimination due to invidious motives or bad faith." *Id.*, citing *State v. Flynt*, 63 Ohio St.2d 132, 135 (1980) and *Freeman* at 58.

**{¶54}** In this case, we decline to address Norma and Charles's claims of selective prosecution. Norma and Charles waived their selective-prosecution argument. "A defense of selective prosecution must be raised in a pretrial motion." *Pepper Pike v. Dantzig*, 8th Dist. Cuyahoga No. 85287, 2005-Ohio-3486, ¶ 15, citing *Cleveland v. GSX Chemical Servs. of Ohio, Inc.*, 8th Dist. Cuyahoga No. 60512, 1992 WL 95735, *5 (May 7, 1992), citing *United States v. Jarrett*, 705 F.2d 198 (7th Cir.1983). Failure to present a selective prosecution argument via pretrial motion operates as a waiver of the defense. *See Lakewood v. Calanni*, 8th Dist. Cuyahoga No. 95610, 2011-Ohio-3465, ¶ 11. *See also* Crim.R. 12(C) ("The following must be raised before trial: (1) Defenses and objections based on defects

in the institution of the prosecution * * *."); Crim.R 12(H) ("Failure by the defendant to raise defenses or objections or to make requests that must be made prior to trial, * * * shall constitute waiver of the defenses or objections, but the court for good cause shown may grant relief from the waiver."). Here, Norma and Charles did not raise the issue of selective prosecution through a pretrial motion, and they did not petition the trial court to grant relief from waiver. Moreover, other than a statement made to the trial court that not all owners of the Property were prosecuted for the zoning violations, there is no indication in the record that Norma and Charles attempted to develop their selective prosecution argument during their trial. (*See* Nov. 28, 2017 Tr. at 7, 93). As such, Norma and Charles have waived the issue on appeal.

{¶55} Norma and Charles's third assignment of error is overruled.

{¶56} Having found no error prejudicial to the appellants herein in the particulars assigned and argued, we affirm the judgments of the trial court.

***Judgments Affirmed***

**ZIMMERMAN and SHAW, J.J., concur.**

**/jlr**